JACKSON TRANSIT AUTHORITY ET AL. *v.* LOCAL DI-
VISION 1285, AMALGAMATED TRANSIT UNION,
AFL-CIO-CLC

No. 81-411.  Argued April 21, 1982—Decided June 7, 1982

BLACKMUN, J., delivered the opinion for a unanimous Court.  POWELL,
J., filed a concurring opinion, in which O'CONNOR, J., joined, *post*, p. 29.

16

*Joseph S. Kaufman* argued the cause for petitioners. With him on the briefs was *William R. Rice.*

*Linda R. Hirshman* argued the cause for respondent. With her on the brief was *Earle Putnam.**

JUSTICE BLACKMUN delivered the opinion of the Court.

Under § 13(c) of the Urban Mass Transportation Act of 1964 (Act or UMTA), 78 Stat. 307, as amended, 49 U. S. C. § 1609(c),[1] a state or local government must make arrangements to preserve transit workers' existing collective-bargaining rights before that government may receive federal financial assistance for the acquisition of a privately owned transit company. This case presents the issue whether § 13(c) by itself permits a union to sue in federal court for alleged violations of an arrangement of this kind or of the collective-bargaining agreement between the union and the local government transit authority.

---

*Briefs of *amici curiae* urging reversal were filed by *John J. Vlahos* and *Ray E. McDevitt* for the American Public Transit Association;· by *Benjamin L. Brown, J. Lamar Shelley, James B. Brennan, Henry W. Underhill, Jr., George Agnost, Roger F. Cutler, John Dekker, Lee E. Holt, George F. Knox, Jr., Walter M. Powell, William H. Taube, John W. Witt, Max P. Zall, Conard B. Mattox, Jr.,* and *Charles S. Rhyne* for the National Institute of Municipal Law Officers; by *William J. Olson* and *James H. Wentzel* for the Public Service Research Council; and by *Donald H. Clark* and *Gregory A. Giordano* for the Tidewater Transportation District Commission.

*Edward J. Hickey, Jr., Michael S. Wolly,* and *Thomas A. Woodley* filed a brief for the Railway Labor Executives' Association as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Joseph H. Elcock* and *Ronald G. Busconi* for the Massachusetts Bay Transportation Authority; and by *W. Stell Huie* and *Terrence Lee Croft* for the Metropolitan Atlanta Rapid Transit Authority.

[1] Originally, § 13(c) was § 10(c). In 1966, the Act was amended, and the section received its present designation. Pub. L. 89–562, § 2(b)(1), 80 Stat. 716. Throughout this opinion, it is referred to as § 13(c).

I

A

When the Act was under consideration in the Congress, that body was aware of the increasingly precarious financial condition of a number of private transportation companies across the country, and it feared that communities might be left without adequate mass transportation. See S. Rep. No. 82, 88th Cong., 1st Sess., 4–5, 19–20 (1963). The Act was designed in part to provide federal aid for local governments in acquiring failing private transit companies so that communities could continue to receive the benefits of mass transportation despite the collapse of the private operations. See §§ 2(b) and 3, as amended, 49 U. S. C. §§ 1601(b) and 1602.

At the same time, however, Congress was aware that public ownership might threaten existing collective-bargaining rights of unionized transit workers employed by private companies. If, for example, state law forbade collective bargaining by state and local government employees, the workers might lose their collective-bargaining rights when a private company was acquired by a local government. See Urban Mass Transportation—1963, Hearings on S. 6 and S. 917 before a Subcommittee of the Senate Committee on Banking and Currency, 88th Cong., 1st Sess., 318–323 (1963) (Senate Hearings) (statement of Andrew J. Biemiller, Director, Department of Legislation, AFL–CIO). To prevent federal funds from being used to destroy the collective-bargaining rights of organized workers, Congress included § 13(c) in the Act. See H. R. Rep. No. 204, 88th Cong., 1st Sess., 15–16 (1963).

Section 13(c) requires, as a condition of federal assistance under the Act, that the Secretary of Labor certify that "fair and equitable arrangements" have been made "to protect the interests of employees affected by [the] assistance." The statute lists several protective steps that must be taken before a local government may receive federal aid; among these

are the preservation of benefits under existing collective-bargaining agreements and the continuation of collective-bargaining rights. The protective arrangements must be specified in the contract granting federal aid.[2]

### B

In 1966, petitioner city of Jackson, Tenn., applied for federal aid to convert a failing private bus company into a public entity, petitioner Jackson Transit Authority. See App. 12a–16a. In order to satisfy § 13(c), the Authority so created entered into a "§ 13(c) agreement" with respondent Local Division 1285, Amalgamated Transit Union, AFL–CIO–CLC, the union that represented the private company's employees. See 29 CFR pt. 215 (1981). Among other things, the § 13(c) agreement guaranteed the preservation of the transit workers' collective-bargaining rights. App. 16a–20a. The Secretary of Labor certified that the agreement was "fair and equitable." Its substance was made a part of the grant contract between the city and the United States, and the city received approximately $279,000 in federal aid.

---

[2] Section 13(c) reads in full:

"It shall be a condition of any assistance under section 3 of this Act that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of the Act of February 4, 1887 (24 Stat. 379), as amended. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements."

Thereafter, until 1975, the Authority's unionized workers were covered by a series of collective-bargaining agreements. Six months after a new 3-year collective-bargaining agreement was signed in 1975, see *id.*, at 31a, however, the Authority notified the union that it no longer considered itself bound by that contract. See *id.*, at 45a.[3]

Ultimately, the union filed suit in the United States District Court for the Western District of Tennessee. It sought damages and injunctive relief, alleging that petitioners had breached the § 13(c) agreement and the collective-bargaining contract. App. 8a, 10a–11a.[4] The District Court concluded that it lacked subject-matter jurisdiction to hear the suit because the complaint rested on contract rights that should be enforced only in a state court. 447 F. Supp. 88 (1977).

The United States Court of Appeals for the Sixth Circuit reversed. 650 F. 2d 1379 (1981). Relying on *Bell* v. *Hood*, 327 U. S. 678 (1946), that court first determined that it had subject-matter jurisdiction under 28 U. S. C. § 1331, because the union's claim arose under the laws of the United States,

---

[3] According to the union's complaint, the Authority since 1966 had contracted with a private individual, T. O. Petty, for the management of the transportation system. App. 6a–7a. The union negotiated its 1975 contract with Petty; when he left as manager of the system, the Authority claimed it was not bound by the contract he had negotiated. *Id.*, at 47a. The union alleged that petitioners had promised in the § 13(c) agreement to be bound by the contracts Petty had signed and that petitioners violated both the § 13(c) agreement and the 1975 collective-bargaining contract. App. 7a–8a.

[4] Prior to filing suit, the union asked the Secretary of Labor and the Secretary of Transportation to find that petitioners had violated the § 13(c) agreement and to ensure that petitioners complied with the agreement. Both Secretaries refused. See 650 F. 2d 1379, 1381 (CA6 1981).

In addition to relief directed at petitioners, the union requested that the two Secretaries be ordered to take appropriate enforcement action against petitioners to compel compliance with the § 13(c) agreement. App. 11a. Both the District Court and the Court of Appeals refused the union's request. See 447 F. Supp. 88, 90–92 (1977); 650 F. 2d, at 1387–1388. The union has not sought review of this ruling, and we express no opinion on that aspect of the litigation.

20

specifically § 13(c). The court then held that § 13(c) implicitly provides a federal private right of action. Section 13(c) reflects national labor policy, the Court of Appeals reasoned, and the rights protected by the statute are thus federal rights. The court concluded that it was consistent with the congressional intent behind § 13(c) to permit enforcement of these federal rights in federal court.

Because of the importance of the interpretation of § 13(c) for local transit labor relations,[5] we granted certiorari. 454 U. S. 1079 (1981).

## II

While the Court of Appeals treated this as a private right of action case, see, e. g., *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353 (1982), it does not fit comfortably in that mold. Indeed, since § 13(c) contemplates protective arrangements between grant recipients and unions as well as subsequent collective-bargaining agreements between those parties, see H. R. Rep. No. 204, 88th Cong., 1st Sess., 16 (1963), it is reasonable to conclude that Congress expected the § 13(c) agreement and the collective-bargaining agreement, like ordinary contracts, to be enforce-

---

[5] Several Courts of Appeals, in addition to the Sixth Circuit, have decided that § 13(c) authorizes federal suits for violations of § 13(c) agreements and collective-bargaining contracts between recipients of UMTA funds and transit unions. *Division 587, Amalgamated Transit Union, AFL–CIO* v. *Municipality of Metropolitan Seattle*, 663 F. 2d 875 (CA9 1981); *Local Div. 714, Amalgamated Transit Union, AFL–CIO* v. *Greater Portland Transit District*, 589 F. 2d 1 (CA1 1978); *Local Div. 519, Amalgamated Transit Union, AFL–CIO* v. *LaCrosse Municipal Transit Utility*, 585 F. 2d 1340 (CA7 1978); *Division 1287, Amalgamated Transit Union, AFL–CIO* v. *Kansas City Area Transportation Authority*, 582 F. 2d 444 (CA8 1978), cert. denied, 439 U. S. 1090 (1979). One Court of Appeals has reached the opposite conclusion. *Local Div. 732, Amalgamated Transit Union* v. *Metropolitan Atlanta Rapid Transit Authority*, 667 F. 2d 1327 (CA11 1982). In a related decision, the First Circuit has concluded that the terms of § 13(c) agreements do not override conflicting provisions of state law. *Local Div. 589, Amalgamated Transit Union, AFL–CIO* v. *Massachusetts*, 666 F. 2d 618 (1981), cert. pending, No. 81–1817.

able by private suit upon a breach. See *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11, 18–19 (1979). The gist of the union's position is not that § 13(c) creates an implied right of action to sue for violations of the statute. Instead, the union argues that "[i]t was the intent of Congress that federal law would determine the binding effect of labor protective agreements under § 13(c) and of the collective bargaining agreements reached pursuant to § 13(c) between unions and recipients of UMTA funds" so that those agreements "are enforceable in the federal courts." Brief for Respondent 24.

The issue, then, is not whether Congress intended the union to be able to bring contract actions for breaches of the two contracts, but whether Congress intended such contract actions to set forth federal, rather than state, claims. Admittedly, since the private right of action decisions address the related question whether Congress intended that a particular party be able to bring suit under a federal statute, those decisions may provide assistance in resolving this case. But the precise question before us is whether the union's contract actions are federal causes of action, not whether the union can bring suit at all to enforce its contracts. See *Local Div. 732, Amalgamated Transit Union* v. *Metropolitan Atlanta Rapid Transit Authority*, 667 F. 2d 1327, 1329–1334 (CA11 1982).[6]

---

[6] Thus, we agree with the Court of Appeals that, strictly speaking, the District Court had jurisdiction under 28 U. S. C. § 1331 to hear the union's suit. Under *Bell* v. *Hood*, 327 U. S. 678, 681 (1946), jurisdiction exists if the complaint is "drawn so as to claim a right to recover under the Constitution and laws of the United States." The complaint alleged a violation of the § 13(c) agreement required by the UMTA and of the subsequent collective-bargaining agreement contemplated by the Act, and prayed for relief under federal law. We do not consider the union's asserted federal claims to be "wholly insubstantial and frivolous," 327 U. S., at 682–683, so that the District Court lacked jurisdiction to entertain the union's suit. Thus, the District Court had jurisdiction for the purposes of determining whether the union stated a cause of action on which relief could be granted. *Id.*, at 682. See also *Wheeldin* v. *Wheeler*, 373 U. S. 647 (1963).

22

As the union points out, on several occasions the Court has determined that a plaintiff stated a federal claim when he sued to vindicate contractual rights set forth by federal statutes, despite the fact that the relevant statutes lacked express provisions creating federal causes of action. In *Machinists* v. *Central Airlines, Inc.*, 372 U. S. 682 (1963), the Court held that a union had a federal cause of action to enforce an award of an airline adjustment board included in a collective-bargaining contract pursuant to § 204 of the Railway Labor Act, 45 U. S. C. § 184 (1958 ed.). Similarly, in *Norfolk & Western R. Co.* v. *Nemitz*, 404 U. S. 37 (1971), the Court ruled that a railroad's employees made out federal claims when they sought to enforce assurances made by the railroad to secure the Interstate Commerce Commission's approval of a consolidation under a provision of the Interstate Commerce Act, 49 U. S. C. § 5(2)(f) (1970 ed.). And recently, in an analogous private right of action decision, the Court permitted a federal suit for rescission of a contract declared void by § 215 of the Investment Advisers Act of 1940, 15 U. S. C. § 80b–15, although the statute itself made no express provision for private suits. *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S., at 18–19. See also *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375, 388 (1970) (recognizing federal right to rescind contracts rendered void by § 29(b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78cc(b)); *American Surety Co.* v. *Shulz*, 237 U. S. 159 (1915) (finding federal-question jurisdiction to hear suit on supersedeas bond required by Rev. Stat. § 1007).

These decisions demonstrate that suits to enforce contracts contemplated by federal statutes may set forth federal claims and that private parties in appropriate cases may sue in federal court to enforce contractual rights created by federal statutes. But they do not dictate the result in this case. Whenever we determine the scope of rights and remedies under a federal statute, the critical factor is the congressional intent behind the particular provision at issue. See, *e. g.*,

*Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S., at 18; *Cannon* v. *University of Chicago,* 441 U. S. 677, 688 (1979); *Machinists* v. *Central Airlines, Inc.,* 372 U. S., at 685–692; see also n. 9, *infra.* Thus, if Congress intended that § 13(c) agreements and collective-bargaining agreements be "creations of federal law," *Machinists* v. *Central Airlines, Inc.,* 372 U. S., at 692, and that the rights and duties contained in those contracts be federal in nature, see *id.,* at 695, then the union's suit states federal claims. Otherwise, the union's complaint presents only state-law claims. See *Miree* v. *De Kalb County,* 433 U. S. 25 (1977).

## III

We begin with the language of the statute itself. See, *e. g., Universities Research Assn., Inc.* v. *Coutu,* 450 U. S. 754, 771 (1981). The bare language of § 13(c) is not conclusive. In some ways, the statute seems to make § 13(c) agreements and collective-bargaining contracts creatures of federal law. Section 13(c) demands "fair and equitable arrangements" as prerequisites for federal aid; it requires the approval of the Secretary of Labor for those arrangements; it specifies five different varieties of protective provisions that must be included among the § 13(c) arrangements; and it expressly incorporates the protective arrangements into the grant contract between the recipient and the Federal Government.[7] See n. 2, *supra.* On the other hand, labor relations between local governments and their employees are the subject of a longstanding statutory exemption from the National Labor Relations Act. 29 U. S. C. § 152(2). Section 13(c) evinces no congressional intent to upset the decision in the National Labor Relations Act to permit state law to govern the rela-

---

[7] The statute also provides that the protective "arrangements shall include provisions . . . which shall in no event provide benefits less than those established pursuant to section 5(2)(f). . . ." As we explain, see n. 9, *infra,* this portion of the statute strengthens the union's position, but we do not consider it at all determinative.

tionships between local governmental entities and the unions representing their employees. See *Cort* v. *Ash*, 422 U. S. 66, 78 (1975) (noting reluctance to permit suit in federal court when "the cause of action [is] one traditionally relegated to state law").

While the statutory language supplies no definitive answer, the legislative history is conclusive. A consistent theme runs throughout the consideration of § 13(c): Congress intended that labor relations between transit workers and local governments would be controlled by state law.

In 1963, Secretary of Labor Wirtz presented the original version of § 13(c) to the relevant House and Senate Committees. Before both Committees, Members of Congress expressed concern about the effect of the statute on state laws. And Secretary Wirtz explained to both Committees that, while attempts would be made to accommodate state law to the preservation of collective-bargaining rights, state law would control local transit labor relations. The Secretary told the House Committee that "this proposal is submitted on this basis, . . . that the State laws must control." Urban Mass Transportation Act of 1963, Hearings on H. R. 3881 before the House Committee on Banking and Currency, 88th Cong., 1st Sess., 482 (1963) (House Hearings). A Committee member raised the issue again; the Secretary repeated that "State laws would be controlling in the situation," though he suggested that there "would be few, if any, situations" where state law and § 13(c) could not be reconciled. House Hearings, at 486. When similar concerns were expressed during his testimony before the Senate Committee, the Secretary reiterated: "I should like it quite clear that I think that there could be no superseding here of the State law." Senate Hearings, at 313.

The House and Senate Reports took the Secretary at his word. The House Report advised that § 13(c) would ensure protection of the interests of workers, but that "subject to the basic standards set forth in the bill, specific conditions for worker protection will normally be the product of local bar-

gaining and negotiation." H. R. Rep. No. 204, 88th Cong., 1st Sess., 16 (1963). The Senate Report was more direct: "In regard to the question as to whether these provisions would supersede State labor laws, the committee concurs in a statement made by the Secretary of Labor 'that there could be no superseding of State laws by a provision of this kind.'" S. Rep. No. 82, 88th Cong., 1st Sess., 29 (1963).

During the debates, the role of state law under § 13(c) was discussed at length. Senators Goldwater and Tower suggested that § 13(c) would supplant state law with federal law. 109 Cong. Rec. 5416 (1963). Senator Williams, one of the bill's chief sponsors, replied: "The legislative history has to be corrected" because "we must have a record that will show that the bill does not preempt State law; it does not control or dominate with irrevocable authority local situations." *Id.*, at 5417. The proposed statute, Senator Williams continued, would not "preempt or be a substitute for State law." *Ibid.* Senator Goldwater remained adamant that "we are attempting a major alteration in the Nation's labor laws." *Id.*, at 5418. But Senator Sparkman, the Chairman of the Senate Committee, repeated the Secretary's assurance that § 13(c) "will not supersede or displace or override" state law. 109 Cong. Rec. 5418 (1963).[8]

---

[8] The union points to the fact that Congress rejected amendments that would have required the continuation of collective-bargaining rights only to the extent not inconsistent with state law. See 109 Cong. Rec. 5422 (1963); *id.*, at 5582; *id.*, at 5684; 110 Cong. Rec. 14980 (1964). But, as Senator Williams explained, those amendments were rejected not because Congress thought § 13(c) would supplant state labor law but because such an amendment was "clearly . . . unnecessary" to guarantee that § 13(c) would not "supersede or preempt or override State law." 109 Cong. Rec. 5421 (1963). Accord: 110 Cong. Rec. 14980 (1964) (remarks of Reps. Multer and Rains).

Beyond the explanation given by Senator Williams and repeated on the House floor, the defeat of these amendments merely reflected a congressional intent that the Federal Government be able to seek changes in state law and ultimately to refuse financial assistance when state law prevented compliance with § 13(c). See 109 Cong. Rec. 5684 (1963) (remarks of Sen. Morse); *id.*, at 5422 (remarks of Sen. Javits).

26

The Senate returned to the issue during a colloquy between Senator Goldwater and Senator Morse. Senator Goldwater feared that the proposed statute would override state laws denying public employees the right to strike. *Id.*, at 5673. Senator Morse assured Senator Goldwater otherwise that "the State law would supervene." *Ibid.* When Senator Goldwater inquired about state laws other than those concerning the right to strike, Senator Morse replied in the same vein: "The amendment does not supersede any State policy." *Ibid.*

In an important exchange, Senator Goldwater noted that local government employers were excluded from the coverage of the National Labor Relations Act, see 29 U. S. C. § 152(2), and asked whether § 13(c) would be inconsistent with that exclusion. 109 Cong. Rec. 5673–5674 (1963). Senator Morse responded that the language of the bill "make[s] it clear that the Taft-Hartley exemptions are not changed by the amendment." *Id.*, at 5674. See also *id.*, at 5422 (remarks of Sen. Javits) (state law could not be overridden "under any phase of the Taft-Hartley law"). Senator Morse underscored the purpose of the amendment: "I cannot emphasize the point more than I already have done in the legislative history in our debate. It deals with municipal and State problems, and not Federal problems." *Id.*, at 5674. Finally, Senator Goldwater asked whether state law would control if there were no specific state law forbidding strikes by public employees. Senator Morse adhered to the same course: "In the absence of any local law, it would be for the State court to decide whether [the employees] had that right." *Ibid.*

A similar, but more abbreviated, interchange took place on the House floor. When some Congressmen questioned the effect of § 13(c) on state law, they were reassured by Congressman Multer that "[n]othing in this bill . . . will infringe upon local law, whether it be of a State or municipality." 110

Cong. Rec. 14980 (1964). And Congressman Rains repeated, "there is not one line in this bill that would vitiate in any way any State or local law." *Ibid.*

Thus, Congress made it absolutely clear that it did not intend to create a body of federal law applicable to labor relations between local governmental entities and transit workers.[9] Section 13(c) would not supersede state law, it would leave intact the exclusion of local government employers from the National Labor Relations Act, and state courts would retain jurisdiction to determine the application of state policy to local government transit labor relations. Congress intended that § 13(c) would be an important tool to protect the collective-bargaining rights of transit workers, by ensuring that state law preserved their rights before federal aid

---

[9] In light of the legislative history of § 13(c), we do not find *Transamerica Mortgage Advisors, Inc.* v. *Lewis*, 444 U. S. 11 (1979), or *Machinists* v. *Central Airlines, Inc.*, 372 U. S. 682 (1963), to be controlling. Both cases turned on the language, purpose, and legislative history of the particular statute involved, see *Transamerica*, 444 U. S., at 18–19; *Machinists*, 372 U. S., at 685–695, and we read the congressional intent behind § 13(c) to be far different from the congressional purpose underlying the statutes at issue in those cases.

*Norfolk & Western R. Co.* v. *Nemitz*, 404 U. S. 37 (1971), of course, is not to be overlooked. In that case, the Court decided that a railroad's employees stated federal claims when they alleged a breach of an agreement entered into by the railroad under § 5(2)(f) of the Interstate Commerce Act, 49 U. S. C. § 5(2)(f) (1970 ed.). Section 13(c) refers to § 5(2)(f) and provides that the protective arrangements shall not provide benefits less than those established by § 5(2)(f). See nn. 2 and 7, *supra*. If, when it passed § 13(c), Congress had expressed an awareness that § 5(2)(f) assurances could be enforced in federal court, or if there was reason to presume such awareness, the reference in § 13(c) to § 5(2)(f) would make this a different case. See generally *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353 (1982). But the legislative history contains no such congressional recognition. Furthermore, *Nemitz* was decided several years after § 13(c) was enacted. Consequently, we find the specific legislative history of § 13(c), not the holding of *Nemitz*, to be determinative.

could be used to convert private companies into public entities.[10]   See 109 Cong. Rec. 5673 (1963) (remarks of Sen. Morse) (if city proposed to reject collective bargaining, it would be ineligible for federal aid).   But Congress designed § 13(c) as a means to accommodate state law to collective bargaining, not as a means to substitute a federal law of collective bargaining for state labor law.[11]

---

[10] The union relies upon the fact that Congress strengthened the language of § 13(c) during the course of its passage.   Congress wrote § 13(c) to require protective provisions "necessary for" the protection of collective-bargaining rights, rather than provisions "as are found to be appropriate for" the protection of those rights, as the Kennedy administration had recommended.   See House Hearings, at 476; 110 Cong. Rec. 14976 (1964). In addition, § 13(c)(2) was amended at the request of Senator Morse to require the "continuation" of collective-bargaining rights rather than the mere "encouragement" of the continuation of those rights.   See 109 Cong. Rec. 5627 (1963); id., at 5685.   But these alterations in the bill demonstrate only that Congress demanded that the Secretary ensure that state law preserved collective-bargaining rights before he provided federal aid for acquisition of a private transit company.   When viewed in conjunction with the discussion of state law in the legislative history, the modifications of the original bill do not prove that Congress intended that federal rather than state law would govern a contract between a UMTA aid recipient and a union representing its employees.

[11] Senator Javits summarized:

"[W]e have a balanced scheme.   We do not override the [state] law; at the same time, we do not compel the Federal Government to go in where the law is adverse to the interest of labor and labor's own point of view, and perhaps also even give encouragement to exempt a situation of this kind where the State desires to get this type of Federal help."   109 Cong. Rec. 5422 (1963).

There remains the possibility that Congress might have intended a federal court to hear the union's claims, but to apply state law.   Such an anomalous result would be inconsistent with the emphasis in the legislative history that § 13(c) addresses "municipal and State problems, and not Federal problems," id., at 5674.   Thus, unless there is an independent source of jurisdiction, such as diversity or pendent jurisdiction, the union must sue in state court.   See Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U. S., at 19, n. 8; Shoshone Mining Co. v. Rutter, 177 U. S. 505, 506–507 (1900).

## IV

Given this explicit legislative history, we cannot read § 13(c) to create federal causes of action for breaches of § 13(c) agreements and collective-bargaining contracts between UMTA aid recipients and transit unions.[12] The legislative history indicates that Congress intended those contracts to be governed by state law applied in state courts.[13]

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, with whom JUSTICE O'CONNOR joins, concurring.

As the Court notes, this case "does not fit comfortably in

---

[12] Based on the legislative history, we could not permit the union to bring a federal suit if we characterized its complaint as alleging that petitioners violated § 13(c) itself by virtue of the alleged contractual breaches. See Brief for Respondent 33-34.

Nor does 42 U. S. C. § 1983 (1976 ed., Supp. IV) permit the union to bring suit. As the Court held in *Maine* v. *Thiboutot,* 448 U. S. 1 (1980), § 1983 encompasses deprivations of rights secured by all "laws" of the United States, of which § 13(c) is, of course, one. But because we have determined that Congress did not intend that breaches of § 13(c) agreements or collective-bargaining contracts would constitute deprivations of federal rights secured by § 13(c), the union has no cause of action under § 1983. See *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.,* 453 U. S. 1, 19-21 (1981).

[13] There are other possible remedies for violations of § 13(c) agreements and collective-bargaining contracts. The union, of course, can pursue a contract action in state court. In addition, the Federal Government can respond by threatening to withhold additional financial assistance. See *Local Div. 589,* 666 F. 2d, at 634-635.

While we hold that the union cannot sue in federal court to enforce its contracts, we express no view on the entirely separate question whether the Federal Government could bring a federal suit against a UMTA funding recipient for violating the terms of its grant agreement with the Government. Such a suit would involve a different contract from the § 13(c) agreement and the collective-bargaining agreement at issue in this case. See generally *Local Div. 732,* 667 F. 2d, at 1338-1339; *Local Div. No. 714,* 589 F. 2d, at 13.

30

[the] mold" of our implied right of action cases. *Ante*, at 20. Congress here provided for the making of contracts that it must have intended to be enforced. The Court thus identifies the question correctly as whether Congress intended those contracts to be enforced in federal court. *Ante*, at 21. This of course is precisely the question on which implied rights of action cases properly are decided. See, *e. g.*, *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 13 (1981); *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 639 (1981).

There are other parallels between this case and those in the more familiar implied right of action "mold." Most significantly to me, both kinds of cases involve the same fundamental issues of congressional and judicial power. By enforcing contract rights not within the jurisdictional grant conferred by Congress, as much as by improperly "inferring" a right of action, "a court of limited jurisdiction necessarily extends its authority to embrace a dispute Congress has not assigned it to resolve. . . . This runs contrary to the established principle that '[t]he jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation . . . ,' *American Fire & Cas. Co.* v. *Finn*, 341 U. S. 6, 17 (1951), and conflicts with the authority of Congress under Art. III to set the limits of federal jurisdiction." *Cannon* v. *University of Chicago*, 441 U. S. 677, 746–747 (1979) (POWELL, J., dissenting).

Because a federal court should exercise extreme caution before assuming jurisdiction not clearly conferred by Congress, we should not condone the implication of federal jurisdiction over contract claims in the absence of an unambiguous expression of congressional intent. As I do not view this position as inconsistent with the reasoning of the Court, I join its opinion.