## AMALGAMATED TRANSIT UNION AFL–CIO, et al., Plaintiffs,

v.

## Raymond J. DONOVAN, Secretary of Labor, Defendant.

### Civ. A. No. 82–2042.

United States District Court, District of Columbia.

Feb. 24, 1984.

---

Michael H. Gottesman, Bredhoff & Kaiser, Washington, D.C., for plaintiffs.

Raymond J. Donovan, Secretary of Labor, Robert C. Seldon, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Under the Urban Mass Transportation Act, 49 U.S.C. § 1601, *et seq.* ("the Act" or "UMTA"), the Secretary of Labor ("Secretary") must determine whether the terms of collective bargaining agreements entered between Unions and their transit companies meet the labor-protective requirements of the Act before he can disburse federal funds to that transit company. In this case,[1] Local Division 732, an unincorporated labor organization and local division of the Amalgamated Transit Union ("ATU" or "Local 732"), AFL–CIO, with its headquarters in Atlanta, Georgia, seeks, *inter alia,* a declaratory judgment that the Secretary has unlawfully certified federal funds to the Metropolitan Atlanta Rapid Transit Authority ("MARTA"). The genesis of this litigation was Georgia's enactment in March, 1982 of a statute ("Act 1506") which plaintiff alleges has prohibited MARTA from continuing certain important collective bargaining rights of its employees. Plaintiff contends that in light of this state legislation the Secretary's disbursement of funds contravenes the requirements of the Act and must be enjoined. Defendants assert that the Secretary has acted lawfully since his decision to certify was within the discretion afforded him under the Act.

This matter is now before the Court on cross-motions for summary judgment. In addition to the well-written briefs and helpful and lively oral argument, the Court has had the benefit of an *amicus curiae* brief submitted by the American Public Transit Association ("APTA"), of which MARTA is a member. For the following reasons, the

---

**1.** The Court has a related case, *ATU v. Donovan,* C.A. 82–2922. *See* 554 F.Supp. 589 (D.D.C. 1982). The parties have stipulated that C.A. 82–2042 shall be resolved first.

Court now grants defendant's motion for summary judgment.

## I.  INTRODUCTION

Because it is necessary to view the parties' positions against the backdrop of almost two decades of labor-management relations in Atlanta, the Court will briefly review those relations before and after passage of UMTA and discuss how the MARTA amendments have altered subjects that had been part of those agreements. In 1965, the George state legislature created a public body corporate to be known as the Metropolitan Atlanta Rapid Transit Authority as a joint instrumentality of the City of Atlanta and the Counties of Fulton, Cobb, DeKalb, Clayton and Gwinett. *See* MARTA Act of 1965, Ga.Laws, 1965, p. 2243 *et seq.*, § 4 (Ex. 2 to Plaintiff's Motion for Summary Judgment ("Pl. Ex." 2)). After the MARTA Act was passed, MARTA acquired all of the common stock of the Atlanta Transit System (ATS), a privately owned company which had previously provided public transportation in Atlanta.

In 1971, MARTA applied to the United States government for a capital improvement grant under UMTA. Pursuant to the procedure outlined in UMTA, the collective bargaining agreement entered between MARTA and its employees was submitted to the Secretary of Labor for his review. The Secretary reviews these collective bargaining agreements to ensure that they satisfy criteria set forth at 49 U.S.C. § 1609(c).[2] That Section provides,

> It shall be a condition of any assistance under [section 1602 of this Title] that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2) of [this Title]. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.

The agreements which result from bargaining between the transit companies and transit employees and which provide for such protections are commonly referred to as Section 13(c) agreements. On August 9, 1971, MARTA and the Union entered an agreement that contained a Section 13(c) agreement. This 1971 agreement was made part of all subsequent UMTA grants to MARTA until 1977.

The pertinent portions of the 1971 Section 13(c) agreement, upon which this litigation is centered, provided that with respect to collective bargaining in general,

> MARTA agrees that it will bargain collectively with the Union or otherwise arrange for the continuation of collective bargaining, and that it will enter into agreements with the Union or arrange for such agreements to be entered into, relative to all subjects of collective bargaining which are or may be proper subjects of collective bargaining with a private employer.

2.  The Secretary of Labor has delegated his authority under Section 13(c) of UMTA to the Assistant Secretary for Labor-Management Relations. The Assistant Secretary has promulgated guidelines at 29 C.F.R. Part 215 regarding his activities in certifying arrangements made for satisfying Section 13(c) of UMTA.

Exhibit 3 to Plaintiff's Motion for Summary Judgment, page 2. The agreement further provided,

> In the case of any labor dispute ... such dispute or controversy may be submitted at the written request of either party hereto to a board of arbitration as hereinafter provided .... The decision by majority vote of the arbitration board shall be final, binding and conclusive....

*Id.* at pp. 4–5.

Pursuant to that section, the board of arbitration consisted of three representatives: one chosen by MARTA and one by the Union who in turn would jointly choose a third and neutral representative. The agreement stated that "the term 'labor dispute' ... shall be broadly construed and shall include ... the making and maintaining of collective bargaining agreements, [and] the terms to be included in such agreements."[3] *Id.* at p. 7.

On February 14, 1977, MARTA entered a new § 13(c) agreement with the Union. The 1977 § 13(c) agreement was incorporated into all subsequent UMTA grants to MARTA since 1977. The 1977 Section 13(c) agreement provided essentially the same protections as were contained in the 1971 Section 13(c) agreement. (Affidavit of Earle W. Putnam ("Putnam Aff"), ¶ 11, attached to Plaintiff's Motion for Summary Judgment). The 1977 Section 13(c) agreement explicitly substituted mandatory binding (interest) arbitration upon impasse over the terms of new collective bargaining agreements. (*Id.* and ¶ 20 to Exhibit.)

On March 16, 1982, the Department of Labor received an UMTA application for operating assistance from MARTA (Affidavit of Hugh Reilly). On March 25, 1982, the Department of Labor referred a copy of the application to ATU and notified MARTA regarding the referral. (Reilly Aff., ¶ 5.) By letter dated March 30, 1982

and received approximately one month later, ATU International President John Rowland stated that ATU would not object if the Department of Labor certified the 1982 application of MARTA on the basis of the terms and conditions stated in the February 14, 1977 Section 13(c) agreement. (Reilly Aff. ¶ 6.) On April 9, 1982, the General Assembly of the State of Georgia enrolled H.B. No. 55, the MARTA Act. That Act was approved by the Governor on April 20, 1982 as Act 1506, 1982 Ga.Laws, p. 5101, *et seq.*, and amends the MARTA Act of 1965. The 1982 Act forbids MARTA from bargaining over five subjects: the assignment of employees, discharge and termination of employees for cause, subcontracting of work, fringe benefits for part-time employees, and assignment and calculation of overtime and forbids MARTA from submitting disputes respecting those five subjects to binding arbitration. (Pl. Ex. 7, p. 5–7.) Lastly, with respect to wages, the 1982 Act provides that there be binding arbitration only upon the consent of both parties. (*Id.* at p. 5.)

On or about April 20, 1982, MARTA rejected ATU's request to use the parties' 13(c) Agreement of February 14, 1977 as a basis for a new 13(c) agreement unless all references to interest arbitration were deleted. (Reilly Aff. ¶ 8.) The parties subsequently reconciled their positions and reduced their agreement on June 3, 1982 to writing that was to be incorporated in the Department of Labor's certification letter of June 11, 1982. That agreement provided, in pertinent part,

> In pending litigation in both federal and state[4] court, MARTA and ATU are in disagreement as to the proper interpretation, application, enforcement and effectiveness of the impasse resolution provisions of the February 14, 1977, agreement, and particularly paragraph 20

---

**3.** The parties engage in one of several forms of "interest" arbitration, as opposed to "grievance" arbitration, when they negotiate those terms that are to be included in a future collective bargaining agreement.

**4.** A Georgia state court eventually held in *MARTA v. Local Division 732,* No. C–836211 (Sup.Ct., August 2, 1982) that MARTA's revocation on February 22, 1982 of its initial consent to arbitrate terms and conditions of a future collective bargaining agreement was valid since it occurred before the final arbitration award.

thereof. However, the parties have agreed that the terms and conditions of the February 14, 1977 agreement should be applied to the above-referenced grant application with the understanding that any issues between them as to the proper interpretation, application, enforcement and effectiveness of the impasse resolution provisions shall be unaffected thereby, and that certification of the February 14, 1977, agreement shall be without prejudice to the position of either party with respect to these impasse provisions. Once litigation has been finally concluded, either party may approach the Department of Labor and request that the Department take further appropriate action in respect thereto.

Reilly Aff. ¶ 9.

By telegram dated June 15, 1982, and letters dated June 21, 1982 and June 22, 1982, ATU requested that the Secretary withdraw his 13(c) certification letter based on the June 11, 1982 decision of the Supreme Court in *Jackson Transit Authority v. Local Division 1285*, 457 U.S. 15, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982), and the enactment on April 20, 1982 of the MARTA Act. (Pl. Ex. 8A and 8B.) By letter dated June 24, 1982, the Department of Labor advised that it had reviewed the *Jackson* decision and the 1982 MARTA Act but would deny ATU's request to withdraw certification, finding that

The Department of Labor is unaware of any facts or circumstances which would render the February 14, 1977 agreement no longer fair and equitable and finds no basis for withdrawal of the certification in question.

(Pl. Ex. 9.)

Plaintiff views those labor protective provisions contained in Section 13(c) agreements since 1971 as "fair and equitable" arrangements. Its view has understandably been supported by the Secretary's certification, during the course of over eleven years, that those provisions satisfy the requirements of UMTA so that federal funds may be awarded. Defendants maintain

that the arrangements can be modified which may be less accommodating to the unions but nevertheless capable of satisfying the "fair and equitable" standards. Basically, plaintiffs ask this Court to find that the MARTA Act prevents the continuation of collective bargaining rights while defendants ask the Court to uphold the Secretary's determination that collective bargaining rights do continue, within the meaning of UMTA, despite the MARTA Act. Since the labor protective standard under UMTA is written in broad and philanthropic language, the parties, as well as the Court, have reviewed the legislative history of UMTA to determine whether Congress intended the Secretary to refer to federal labor-management policy or an individual state's labor history and legislative response in deciding what was "fair and equitable."

## II. PRIOR JUDICIAL TREATMENT OF THIS CONTROVERSY

The Supreme Court, other federal courts and several state courts [5] have analyzed the UMTA Act and have reviewed various Section 13(c) agreements. Although the Court considers the issue presented here to be one of first impression, the parties have argued that those other decisions are dispositive of this issue and even that language contained in those other opinions should guide this Court.

In *Jackson Transit Auth. v. Local Division 1285, supra,* the Supreme Court reversed five Circuit Courts of Appeal that had found an implied federal cause of action under Section 13(c). The five courts reasoned that because federal funds were conditioned on the Secretary's approval of 13(c) agreements, a union aggrieved by a transit company's failure to comply with a provision in its 13(c) agreement had a federal right of action. Based on its review of the legislative history of UMTA, the Court concluded that Congress did not intend, through Section 13(c), to create a body of federal law applicable to labor relations

5. *See e.g.* fn. 4, *supra.*

between local governmental entities and transit workers. *Id.* at 27, 102 S.Ct. at 2209. The Supreme Court thus held that state courts were the appropriate forum in which to resolve suits by a union against a transit company that required the interpretation of a collective bargaining agreement. *Id.* at 29, 102 S.Ct. at 2210. Thus, the Court concluded that absent an independent source of subject-matter jurisdiction, such as diversity or pendent jurisdiction, a District Court lacks jurisdiction to hear a union's suit against a transit company for breach of a 13(c) agreement.

At the District Court level, plaintiffs in *Jackson* had brought a mandamus claim against the Secretaries of Labor and Transportation to enforce the 13(c) mandatory interest arbitration provision. The District Court held that it had no subject-matter jurisdiction to hear the mandamus claim. The Sixth Circuit Court of Appeals reversed and held that the District Court had subject-matter jurisdiction (at least to determine whether a cause of action existed) but remanded for it to enter a judgment dismissing the mandamus claim for failure to state a claim upon which relief could be granted. *Local Division 1285 v. Jackson Transit Auth.*, 650 F.2d 1379, 1387–88 (6th Cir.1981). Because the dismissal of the Secretaries was not appealed, the Supreme Court did not have to address the issue of whether a federal district court would have jurisdiction over a union's suit against federal officials to enforce a provision in a 13(c) agreement. But it did comment that, strictly speaking, the District Court had jurisdiction under 28 U.S.C. § 1331 to hear the union's suit. *Jackson,* 457 U.S. at 21 n. 6, 102 S.Ct. at 2206.[6] Plaintiffs urge that, based on *Jackson,* the Supreme Court would authorize the remedy they seek in this Court. The plaintiffs cite *Jackson* as support for the result they urge here. While the Supreme Court in *Jackson* did mention the Secretary's duty under UMTA, its opinion did not dictate, or even suggest any precise standard governing Secretarial actions.

In *Local Division 589 v. Massachusetts,* 666 F.2d 618, (1st Cir.1981) *cert. denied,* 457 U.S. 1329, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982), the First Circuit Court of Appeals was called upon to review the legislative history of UMTA. In that case, plaintiffs challenged the constitutionality of a Massachusetts statute which altered the terms of a collective bargaining agreement so that it conflicted with a § 13(c) agreement. The Court crystallized the issue as

whether Congress intended § 13(c), or to be more specific, whether it intended assurances made pursuant to § 13(c) to override conflicting State law. If not, State law governs—although the federal statutory scheme may provide other remedies for violation of an assurance.

*Id.* at 627. The Court reasoned that Congress intended State law, not § 13(c) assurances, to prevail in case of a conflict. *Id.* It therefore concluded that "specific detailed assurances given by a union and a transit authority to the Labor Department under (UMTA) § 13(c) do not invalidate a State law to the contrary." *Id.* at 636.

Plaintiffs do not find the Massachusetts case, as it has been dubbed, to be dispositive of the issue presented here. They do not quarrel with the premise that a State can amend its laws concerning collective bargaining to conflict with Section 13(c) assurances. Rather, they urge that if the State law goes too far, the Secretary will breach his duty under UMTA by awarding federal funds. According to ATU,

The law [Act 1506] so skews arbitration of the remaining subjects in favor of management as to render arbitration useless as a means of preserving employee rights and interests. This grant recipient's willingness and capacity to agree to interest arbitration was, under 13(c), the condition of the receipt of the federal grant transferring the employees of the grant recipient out of private employment and depriving them of the federal guarantee of the right to strike. Georgia has now legislated MARTA out of its

6. The Court will address the reviewability issue in Section IIIA, *supra.*

ability thus to agree to bargain and to arbitrate.

June 21, 1982 letter from John Rowland, International President, ATU, to Assistant Secretary of Labor Donald L. Dotson, Pl.Ex. 8.

For the reasons stated *infra,* the Court declines to declare that the Secretary acted arbitrarily and capriciously under UMTA by finding that Act 1506 did not require that he withhold federal funds from MAR-TA.

## III. ANALYSIS

### 1. *Reviewability*

The Court finds the Secretary's action to be reviewable. It thus rejects defendant's contention that the Secretary's duty is "so committed to his discretion" that there is no law to apply. *See* 5 U.S.C. § 701(a)(2). This Circuit has recognized that the existence of agency discretion in itself "hardly constitutes grounds for concluding that agency action is unreviewable." *Local 1219, American Federation of Government Employees v. Donovan,* 683 F.2d 511 (D.C.Cir.1982).

That proposition would therefore hardly be persuasive against the strong presumption that generally agency actions are subject to judicial review. *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1043 (D.C.Cir.1979). Defendants have not met their burden of demonstrating that "a fair appraisal of the legislative scheme, including a weighing of practical and policy implications of reviewability persuasively [indicates] that judicial review should be circumscribed," *Local 2855, American Federal of Government Employees v. United States,* 602 F.2d 574, 578 (3rd Cir.1979); *accord, International Ladies' Garment Workers Union, et al. v. Donovan,* 722 F.2d 795 (D.C.Cir.1983); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967). For these reasons, the Court will review whether the Secretary of Labor has breached the duty imposed on him by UMTA.

As an aid to defining the scope of this Court's review, the parties have directed the Court's attention to the Supreme Court's decision in *Motor Vehicle Manufacturers Assoc. v. State Farm Mutual Automobile Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In that case, the Supreme Court reviewed the Secretary of Transportation's decision to rescind a previous requirement that vehicles manufactured be equipped with passive restraints. In *State Farm,* the Supreme Court found that a court would not use the same standard to review an agency's revocation of one of its rules as it would an agency's refusal to promulgate a rule in the first place. 103 S.Ct. at 2866. The Court reasoned that an agency that had reversed its position had a greater burden of explaining its change than one that did not act in the first place. *Citing Atchison T. & S.F.R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 807–08, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973), the Court explained that

a settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to.

*Id.* 103 S.Ct. at 2866. The Supreme Court concluded that the agency had failed to support its decision to change its course with a reasoned analysis and therefore declared the action arbitrary and capricious.

Plaintiffs urge the Court to approach this case as the Supreme Court did in *State Farm.* They contend that the Secretary's consistent certification of 13(c) agreements that provide for submitting labor disputes to binding interest arbitration demonstrates his determination that those labor protective provisions best meet UMTA's mandate. The Court has considered exactly how much weight it should give the prior practice. Based on its review of the legislative history, which will be explained *infra,* the Court does not agree with the plaintiffs that prior practice necessarily es-

tablishes the only valid interpretation of the requirements of the Act. As this Circuit explained in *Bldg. & Constr. Trades Dept., AFL–CIO v. Donovan,* 712 F.2d 611, 619 (D.C.Cir.1983),

> Prior administrative practice carries much less weight when reviewing an action taken in the area of discretion, when little more than a clear statement is required, than when reviewing an action in the field of interpretation where it is thought that the agency's contemporaneous and consistent interpretation of one of its enabling statutes is reliable evidence of what Congress intended.

*Id.* at 619.

The Secretary's concern in certifying is not solely that certain, specific labor protective provisions are present in collective bargaining agreements. His duty is to scrutinize the agreement as a whole to ensure that it is fair and reasonable. His duty is couched in such broad terms because he must review collective bargaining agreements from states with varying collective bargaining laws to ensure that each is fair and equitable, taking into account various data. While *Local Div. 589, supra,* is not on all fours with this case, the Court agrees with the First Circuit's analysis of the congressional intent in enacting UMTA. That court explained,

> Congress's general intent to secure fair arrangements does not require the implementation of any *particular* set of detailed provisions. Indeed, if the specific detailed provisions of a § 13(c) assurance prevail over *any* conflicting change in State law, the Secretary of Labor would lose any ongoing power to exercise discretion—to decide whether or not a change makes the State system as a whole unfair to the transit workers. This result would be anomalous given a legislative history stressing the need for flexibility and discretion ... If (a State changes its laws contrary to the policy of § 13(c)), the Secretary might halt the flow of funds or take other appropriate action. In any event, such an enforce-

ment scheme is more consistent with congressional intent than the alternative urged upon us by the Transit Union: namely that § 13(c) permanently binds States to the details of § 13(c) assurances and referenced collective bargaining agreements entered into perhaps a decade earlier, regardless of whether changes in State law are, in any overall sense, unfair.

*Id.* at 634–35 (citations omitted) (emphasis in original).

The inquiry thus boils down to whether the Secretary abused his discretion by finding that the collective bargaining agreement, as affected by the MARTA Act of 1982, was a fair and equitable one and provided for the continuation of collective bargaining rights. With respect to the last requirement, the Court must analyze the philanthropic phrase, "the continuation of collective bargaining rights." Since these words by themselves do not provide clear guidance, the Court will discuss what the legislative history intended with respect to "continuation" and "collective bargaining rights." The Court must decide what type of collective bargaining rights Congress wanted the Secretary to ensure were continued. Secondly, the Court must decide whether federal or State law defines those collective bargaining rights.

The specific dispute before the Court involves five collective bargaining subjects. Plaintiffs contend that the MARTA Act precludes MARTA from bargaining about five subjects, over which MARTA employees bargained before they were publicly acquired. According to their interpretation of UMTA, the Secretary's duty is to ensure that there is a continuation of those collective bargaining rights that MARTA employees enjoyed prior to public acquisition of that company. Defendants maintain that what was to continue was the process of collective bargaining itself and not any particular provisions. Plaintiffs express their concern that if particular provisions are abandoned and a general, amorphous standard replaces it, collective bargaining may be made so difficult as to

abridge that process completely. An example will clarify their practical concerns. Defendants emphasize that the agreement ensures that collective bargaining will continue since amendments to the MARTA Act provide for the presentation of bargaining disputes to interest arbitration upon mutual consent only after several other courses are pursued. Plaintiff's fear that management's refusal to consent to submitting a dispute to binding interest arbitration will effectively result in imposing on the union's certain unfavorable terms.

A review of the legislative history of UMTA makes it clear that Congress never intended plaintiff's specific and constricted interpretation. Congress was concerned that the public takeover of private mass transit companies and the use of federal funds for labor saving automation would adversely affect transit workers. Congress intended that there be some protections for those groups of workers who would bear the direct effect of a change. Secretary of Labor Willard Wirtz testified concerning the clause in the first sentence of 13(c), "to protect the interests of employees affected by such assistance," that

> it is intended to cover those employees, present employees, whose interests would be adversely affected by a change, and it would not be intended to establish protections for the future as far as new employees are concerned.

*Hearings on S. 6 and S. 917 Before the Subcomm. on Housing of the Senate Comm. on Banking and Currency,* 88th Cong., 1st Sess. 317. Thus the phrase "continuation of collective bargaining rights" cannot be considered alone but must be read with reference to that group of people to whom those protections were directed. In conclusion, the reference point is workers affected by transitions, e.g., either by merger, acquisition or automation. Additionally, as the Court has explained *supra,* "continuation" cannot be read to bind either transit unions or their employers to those particular provisions in place when there was a transition from private to public employment.[7] Such an interpretation would result in an inflexible and unworkable scheme.

Secondly, plaintiffs urge that in interpreting which "collective bargaining rights" must be afforded, the Secretary should have used and this Court must use as a reference point federal rather than State labor law and policy. Alternatively, they argue that if State law was to be the reference point, this does not evince Congress' intent that the Secretary would be willing to accept ever-changing state or local laws to define the federal standard. This argument contradicts several congressional concerns expressed in UMTA's legislative history. Congress recognized the local nature of the issue and was fully aware that states and localities would be changing their laws regarding collective bargaining. Precisely because mass transit operates on an intrastate basis, federal dictation of labor standards would be inappropriate. The Supreme Court recognized in *Jackson,*

> Congress made it absolutely clear that it did not intend to create a body of federal law applicable to labor relations between local governmental entities and transit workers.

457 U.S. at 27, 102 S.Ct. at 2209. And in *Local Div. 589,* the First Circuit explained,

> Whether or not such a federal presence is desirable, we cannot interpret the ambiguous language of § 13(c) to create it without a fairly clear indication that such was Congress's intent. Unlike railway and airline workers, we are here considering workers for *local* transit companies whose employers, by and large, are municipalities or state governments. Moreover, in the National Labor Relations Act Congress explicitly exempted

---

**7.** Parenthetically the Court notes that the agreement between Local Division 732 and ATS from June 21, 1969 to June 20, 1972 contained no provision for the arbitration of a new collective bargaining agreement but permitted either party to request grievance arbitration. *See* Ex. 2, *Amicus* brief in support of defendant.

public employees, such as MBTA workers, from federal labor legislation.

*Id.* at 633.

In testifying before the Senate, Secretary Wirtz stated

> To the extent that the State law prohibits both in letter and in practice any collective bargaining where municipal employees are concerned, the kind of thing that you have suggested, with that change, there would be the necessity of administrative action as to whether or not under those circumstances there could be fair and equitable protection of the employees' rights.

Senate hearings at 482.

In the Secretary's view, neither the Supreme Court's decision in *Jackson* nor the passage of the 1982 MARTA Act necessitated his determining that the § 13(c) agreement at issue was not fair and equitable, as plaintiffs had urged. The legislative history of UMTA evinces a concern that the policy of collective bargaining continue. In the Secretary's determination, the MARTA Act does not result in such an abridgement of that process that he was required to cut off federal funds. The Court would be contorting the legislative history to declare that the collective bargaining agreements must have exactly the same, or effectively the same provisions they had over 11 years ago. The far greater implication of such a ruling, however, is that it would, in essence, dictate those terms that must be included in the particular collective bargaining agreement before it, be read to suggest appropriate terms to be included in other agreements and clearly substitute this Court's judgment for the agency's decision-making process. While the Court has found it appropriate to review the Secretary's decision, it does not find his decision to be arbitrary and capricious and therefore cannot overrule it.

An appropriate order and judgment shall issue.