663 F.Supp. 1560 (1987)
AMALGAMATED TRANSIT UNION, LOCAL 1277, AFL-CIO, an unincorporated association, Plaintiff,
v.
SUNLINE TRANSIT AGENCY, a public corporation, Defendant.
No. CV 86-8270 RG(Gx).
United States District Court, C.D. California.
July 7, 1987.
*1561 *1562 Glen Rothner, member of Reich, Adell & Crost, Los Angeles, Cal., Joseph Freitas, Jr., Lynn C. Rossman, Neyhart, Anderson, Nussbaum Reilly & Freitas, San Francisco, Cal., for Amalgamated Transit Union, Local 1277.
Ronald J. Klepetar, Rexon, Freedman, Klepetar & Thomas, A Professional Corp., Los Angeles, Cal., for defendant.

OPINION AND ORDER
GADBOIS, District Judge.
Plaintiff Amalgamated Transit Union, Local 1277 ("ATU" or "the Union") requests this court to preliminarily enjoin defendant Sun Line Transit Agency ("STA" or "the Agency") from instituting a random, mandatory alcohol and drug testing program. STA, a public corporation that provides mass transit in Palm Springs, California, employs forty bus drivers and ten maintenance workers ("public employees" or "employees"). The Union is the exclusive bargaining representative of the Agency's employees.
On December 18, 1986, this court issued a temporary restraining order enjoining STA from instituting its program. On February 23, 1987, the court heard oral argument and took the Union's motion for a preliminary injunction under submission.
The Union's motion is granted. The court holds that STA's program violates the Fourth Amendment's prohibition against unreasonable searches and seizures insofar as it is wholly random and is not based on a reasonable suspicion that the employee is under the influence of alcohol or drugs.

I. BACKGROUND
The record does not disclose a single documented case of alcohol or drug abuse by a public employee, nor does STA allege such use has resulted in a bus accident. Despite this lack of evidence of abuse, the Agency enacted a "Substance Impairment Policy" in September 1986. The Policy includes alcohol and drug testingincluding random testingof employees. Shortly after STA implemented the Policy, the Union asked the Agency to stop testing until it could file a grievance. The current Collective Bargaining Agreement ("CBA") allows for non-binding arbitration of "[a] grievance ... with respect to the interpretation or application of any term of [the CBA]." Declaration of Ronald J. Kleptar ("Kleptar Declaration"), May 7, 1987 at 2.[1]
The Agency continued to test the public employees, under Union protest, between September and November 1986. It did not discipline any employees during this period for alcohol or drug abuse. STA then discontinued testing to consider the Union's grievance. Before the grievance procedure provided under the CBA was completed, however, the Agency told ATU that it would resume testing.
The Union then filed a complaint for "injunctive and declaratory relief against the imposition of a sweeping, random drug testing program on its public employees which violate (sic) the United States Constitution." Verified Complaint for Injunctive and Declaratory Relief from Violations of Constitutional and Statutory Rights ("Complaint") at 1. The complaint alleged violations of the Fourth Amendment's proscription against unreasonable searches and seizures, the Fourteenth Amendment's Due Process Clause, the Fifth Amendment's Self-Incrimination Clause and the right to privacy. This court issued a temporary restraining order against the Agency in *1563 December 1986 based on allegations made in the complaint.

A. The Collective Bargaining Agreement

Article 12 of the CBA, which expires on March 31, 1990, provides for discipline and grievance procedures. Under this provision, STA may "discharge, suspend or render other appropriate discipline for just cause." Just cause "shall include but not be limited to ... drinking or being under the influence of alcohol or drugs while on SunLine property or during working hours [and] the possession of alcohol or illegal drugs while on SunLine property or during working hours...." Kleptar Declaration at 7.
Article 12 also provides a three-step grievance procedure, which applies when an employee is discharged, suspended or disciplined for "being under the influence of alcohol or drugs." See Memorandum of Understanding Between STA and ATU Division 1277, Exhibit A to Complaint at Article 12, Section 2a. According to the procedure, the employee must first attempt to resolve his dispute with his immediate supervisor. The employee may request Union assistance. Id. Second, if the supervisor does not resolve the dispute within ten days, the employee must present his grievance, in writing and through the Union, to STA's General Manager. The General Manager has ten days to meet with the employee and provide a written answer. Id. at Section 2(b).
Finally, if the General Manager does not resolve the dispute, the matter is submitted to "the Board of Arbitration" ("the Board"). The Board consists of an arbitrator chosen by the Agency, one chosen by the Union, and one chosen by both. The Board then "render[s] a nonbinding recommendation to the Agency's Board of Directors within thirty ... days of the date the matter is submitted to the Board." Kleptar Declaration at 6. The Board renders a binding decision only for employment discharge cases. Id.

B. STA's Substance Impairment Policy

The Agency promulgated the Substance Impairment Policy in September 1986. It provides for four types of mandatory alcohol and drug testing: (1) at the pre-employment physical; (2) at a bi-annual medical examination, required for bus drivers under California law to obtain a Class II driver's license; (3) testing based on reasonable suspicion; and (4) random testing. See Exhibit A at 2-3. This court considers only mandatory, random testing.[2]
In the Policy, STA describes its goals in implementing chemical testing as: "promoting high standards of responsibility to the public, a safe environment in which to work, and reliable performance." Id. at 1. STA also stated that it instituted mandatory, random testing in response to fatal accidents involving other companies such as the Los Angeles Rapid Transit District. Memorandum of Points and Authorities in Opposition to Preliminary Injunction ("Opposition") at 4-5.
The Policy outlines a detailed testing procedure. See Exhibit A at 5-7. First, STA randomly selects an employee, who is given travel directions to a laboratory and a sealed envelope containing a Chain of Custody ("C of C") form. The C of C form contains a control number, used only by STA's Personnel Department to identify the employee. The employee is given an Agency car to drive to the laboratory.
At the lab, the employee uses a private restroom and gives a urine sample to a technician. The employee then completes the C of C form. The employee is required to list on the form any drugs taken in the previous two weeks, including prescription and over-the-counter medications. See Exhibit A at 8. The technician checks over the C of C form and seals the sample. The employee then returns to work, and a courier takes the urine sample to another lab where the first test is performed.
*1564 All tests are completed on the same sample, although the employee can request that an independent test be completed. The first test is an "EMIT" test, which STA claims is ninety-five percent accurate. According to the Policy, a second, or "reflex" test is completed only if the EMIT test is positive. If the reflex test is positive, the technician "analyze[s] the positive and compare[s] it against the Chain of Custody form." Exhibit A at 6. If an over-the-counter or prescribed drug could have triggered a positive result, no further testing is completed.
If, however, a positive result on the reflex test indicates that the employee used a drug that was not disclosed on the C of C form or an an illegal drug, a third, or "thin-layer chromatography" test is completed on the sample at the Mayo Clinic in Rochester, Minn. The Policy states that this test "is the most accurate urine test available." Id.
If an employee receives positive results on the first two tests, he is "counseled." If a legal drug caused the positive results, the counselor tells the employee whether the legal drug could affect his job performance. An employee so counseled is then placed in a pool, with employees who have received similar positive results. These employees are subject to more frequent random tests.
If an illegal drug or a legal drug that could affect performance caused the positive results, the employee must undergo further "counseling" or "rehabilitation." Rehabilitation consists of six visits to a treatment center. The employee is on an unpaid leave while undergoing treatment, and STA's Personnel Department is apprised of his progress. A "rehabilitated" employee is reinstated, but this status is available only once. The Policy states that a rehabilitated employee who receives any further positive results will be immediately fired. Id. at 7. An employee who refuses to submit to testing will presumably be fired, although the Policy is silent on this point.

II. STANDARD FOR PRELIMINARY INJUNCTION
To obtain a preliminary injunction, plaintiff must show "either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." Benda v. Grand Lodge, 584 F.2d 308, 314-15 (9th Cir.1978), cert. dismissed, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979) (quoting William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 526 F.2d 86, 88 (9th Cir.1975)).
These are not two distinct tests, however, but "merely extremes of a single continuum." Benda, 584 F.2d at 315. Thus, the more the balance of hardships weighs in favor of the moving party, the less a showing of success on the merits must be made. Benda, 584 F.2d at 315; Oakland Tribune, Inc. v. Chronicle Publishing Co., 762 F.2d 1374, 1376 (9th Cir. 1985). The moving party must always show that a significant threat of irreparable injury exists for a preliminary injunction to issue. Oakland Tribune, 762 F.2d at 1376.
The Union meets the test for a preliminary injunction. First, the court finds that the Union will prevail on the merits because the Policy violates the Fourth Amendment. Second, irreparable harm may occur if a preliminary injunction is denied because constitutional rights of the public employees will be violated if the Agency is allowed to conduct random alcohol and drug tests during the pendency of this action. Third, the balance of hardships tips decidedly in favor of the Union. The public employees will immediately be subjected to random testing if a preliminary injunction is denied.

III. AVAILABILITY OF ARBITRATION
Before discussing the federal constitutional issues presented by ATU, this court must address the Union's claim that national labor policy justifies maintaining the status quoby issuing a preliminary injunction "pending arbitration." ATU argues *1565 that since "the grievance procedure contained in the contract between it and the defendant ultimately results in neutral, third party, binding arbitration ... this dispute is one that should be resolved by the arbitration process." Memorandum of Points and Authorities in Support of Temporary Restraining Order ("Plaintiff's Memorandum") at 12.
In support of this proposition, the Union cites the well-known national labor policy that binding arbitration is the favored method of dispute resolution. See, e.g., Boys Market v. Retail Clerks Union, 398 U.S. 235, 242-43, 90 S.Ct. 1583, 1592-94, 26 L.Ed.2d 199, 204-06 (1970), United Steelworkers v. American Mfg. Co., 363 U.S. 564, 566, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403, 1406 (1960). Yet state, not federal law, governs the labor side of this dispute, because the National Labor Relations Act expressly excludes local government employers from its coverage. 29 U.S.C. § 152(2) (1982). See Jackson Transit Authority v. Transit Union, 457 U.S. 15, 23-24, 102 S.Ct. 2202, 2207, 72 L.Ed.2d 639, 647 (1982) (congressional intent "to permit state law to govern relationships between local governmental entities and the unions representing their employees"). In fact, STA has no obligation under California law or its CBA with the Union to submit this dispute to binding arbitration.
The Union and the Agency disagree as to whether the Meyers-Milias-Brown Act, Cal.Gov't.Code §§ 3500-10 (West 1980), permits local government employers to contract for binding arbitration in disputes such as this one. In Taylor v. Crane, 24 Cal.3d 442, 155 Cal.Rptr. 695, 595 P.2d 129 (1979), the California Supreme Court indicated that some issuessuch as the discipline of police officersmay be submitted to arbitration under the Act, while otherssuch as the statutory duty of cities to fix employee salariesmay not. Taylor does not answer whether a grievance based on a comprehensive drug-testing scheme could be made subject to a binding arbitration provision, but the argument is moot because the parties have not included such a clause in their CBA.
Article 12 of the CBA provides for nonbinding arbitration of grievances, except for employment discharges. Kleptar Declaration at 6. As noted earlier, the third and final step of the grievance procedure provides that unresolved matters shall be "submitted for resolution to the Board of Arbitration...." Id. Thus, despite the appearance of a detailed grievance provision, STA has absolute discretion to disregard the decision of the Board should the Board arbitrate the propriety of random, mandatory drug testing.
Two conclusions can be drawn from the arbitration clause. First, any order by this court requiring STA to abide by the provisions of Article 12 and barring unilateral implementation in the interim of its random drug-testing program would be futile. Given its stance in this litigation, the Agency would certainly ignore an adverse recommendation by a Hearing Officer. Second, the parties have not agreed to be bound by arbitration in this matter, and cannot be required to do so. Thus, although the court would prefer to settle this controversy under state labor or contract law, it reluctantly concludes that it cannot. Accordingly, ATU's various federal constitutional claims will be analyzed below.

IV. CONSTITUTIONAL ANALYSIS

A. Search and Seizure

The Fourth Amendment to the United States Constitution states:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated....
In addressing the constitutionality of STA's Substance Impairment Policy, the court must make two threshold inquiries: first, whether the Fourth Amendment's prohibition against unreasonable searches and seizures is enforceable against STA; and second, whether the company's random alcohol and drug testing program constitutes a "search" or a "seizure."
The Fourth Amendment applies to the conduct of state government actors through the Due Process Clause of the *1566 Fourteenth Amendment. Wolf v. Colorado, 338 U.S. 25, 27-28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782, 1785 (1949); Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961). A municipally operated bus company constitutes a state actor for Fourth Amendment purposes. See O'Connor v. Ortega, ___ U.S. ___, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (state hospital officials); New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (school authorities); Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (building inspectors).
Furthermore, STA's Substance Impairment Policy implicates constitutionally cognizable interests of the public employees. The Fourth Amendment
protects two types of expectations, one involving "searches," the other "seizures." A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interest in that property.
United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85, 94 (1984) (footnotes omitted). According to this definition, STA's program is both a search and seizure and thus triggers Fourth Amendment protections. With regard to one's expectation of privacy in bodily integrity and the interference with that interest, the court considers mandatory urinalysis, while physically painless and less intrusive, roughly equivalent to the blood testing expressly held to be a search and seizure in Schmerber v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908, 918 (1966).
STA attempts to distinguish Schmerber because: first, blood testing, but not urinalysis, involves a physical intrusion into the body; second, urine or other bodily waste is customarily abandoned without concern; and third, STA's employees have no reasonable expectation of privacy in their urine. In rejecting STA's argument, the court considers Judge Sarokin's analysis in Capua v. City of Plainfield, 643 F.Supp. 1507 (D.N.J.1986), to be sound:
Though urine, unlike blood, is routinely discharged from the body so that no actual intrusion is required for its collection, it is normally discharged and disposed of under circumstances that merit protection from arbitrary interference.... As with blood, each individual has a reasonable expectation of privacy in the personal "information" bodily fluids contain. For these reasons, governmental taking of a urine sample constitutes a search and seizure within the meaning of the Fourth Amendment.
643 F.Supp. at 1513.
The Supreme Court has never determined the proper Fourth Amendment analysis for alcohol and drug testing of public employees, and recently declined to address the issue. O'Connor v. Ortega, ___ U.S. at ___, 107 S.Ct. at 1504 n. **, 94 L.Ed.2d at 730 n. *. This court nevertheless joins a number of lower federal courts in holding that urinalysis is a search and seizure under the Fourth Amendment. See McDonell v. Hunter, 809 F.2d 1302, 1307 (8th Cir.1987); Capua v. City of Plainfield, 643 F.Supp. at 1513; Jones v. McKenzie, 628 F.Supp. 1500, 1508-09 (D.D. C.1986); Allen v. City of Marietta, 601 F.Supp. 482, 488-89 (N.D.Ga.1985); Storms v. Coughlin, 600 F.Supp. 1214, 1217 (S.D. N.Y.1984).[3]
Having determined that the Fourth Amendment is implicated, this court faces the task of analyzing the constitutionality of STA's random testing program. This inquiry is difficult because it involves considering many important competing interests: the Fourth Amendment's overall mandate of "reasonableness," traditional search and seizure jurisprudence requiring a warrant based on probable cause, the Supreme Court's willingness to allow a lower quantum of proof in limited cases, the role of government as employer rather than sovereign, and the pressing societal interest in safe public transportation. *1567 While noting the concerns advanced by STA in support of alcohol and drug testing, this court nevertheless holds that the public employer's mandatory program violates the Fourth Amendment insofar as it is wholly random and is not based on a reasonable suspicion that the employee is under the influence of alcohol or drugs.
The text of the Fourth Amendment requires that searches and seizures be reasonable. "The basic purpose of this Amendment ... is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935 (1967); Michigan v. Tyler, 436 U.S. 499, 504, 98 S.Ct. 1942, 1947, 56 L.Ed.2d 486, 495 (1978). In order to safeguard these interests, "one governing principle, justified by history and by current experience, has been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is `unreasonable' unless it has been authorized by a valid search warrant." Camara, 387 U.S. at 528-29, 87 S.Ct. at 1730-31, 18 L.Ed.2d at 935; Tyler, 436 U.S. at 506, 98 S.Ct. at 1948, 56 L.Ed.2d at 496. Even in circumstances where warrantless searches are permitted, they ordinarily "must be based on `probable cause' to believe that a violation of the law has occurred." New Jersey v. T.L.O., 469 U.S. 325, 340, 105 S.Ct. 733, 743, 83 L.Ed.2d 720, 734 (1985).
Yet despite their historical underpinnings, the Supreme Court has determined that neither a warrant nor the presence of probable cause are irreducible requirements of a valid search and seizure. "The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although `both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, ... in certain limited circumstances neither is required.'" T.L.O., 469 U.S. at 340, 105 S.Ct. at 743, 83 L.Ed.2d at 734 (quoting Almeida-Sanchez v. United States, 413 U.S. 266, 277, 93 S.Ct. 2535, 2541, 37 L.Ed.2d 596, 605 (1973) (Powell, J., concurring).
A warrant requirement is unsuitable when "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." Camara, 387 U.S. at 533, 87 S.Ct. at 1733, 18 L.Ed.2d at 938; see Schmerber v. California, 384 U.S. at 757, 86 S.Ct. at 1835-36, 16 L.Ed.2d at 919-20 (warrantless blood test of suspected drunk driver). Furthermore, "[w]here a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard." T.L.O., 469 U.S. at 341, 105 S.Ct. at 743, 83 L.Ed.2d at 734.
Under these authorities, this court holds that a public employer may constitutionally require the mandatory alcohol and drug testing of employees in jobs directly related to mass public transportation without a search warrant or a showing of probable cause. As the court noted in Schmerber, evidence of alcohol consumptionor in this case, drug usage as welldiminishes quickly as the body functions to eliminate it from the system. In Cupp v. Murphy, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), a limited warrantless search was justified in part to preserve readily destructible evidence thought to exist under a murder suspect's fingernails. Similarly, the difficulties of timing and evanescent evidence render a warrant requirement unsuitable in this case. A bus driver who is reasonably suspected of being under the influence of alcohol or drugs could avoid formal detectionand, conceivably, begin his shift behind the wheel with impunity if STA officials were required to first obtain a warrant.
A balancing of interests in this case also leads to the conclusion that a probable cause standard is inappropriate. Although the plurality in O'Connor v. Ortega declined to address chemical testing, Justice O'Connor's discussion regarding "searches conducted pursuant to an investigation of work-related employee misconduct" is insightful:

*1568 Public employers have an interest in ensuring that their agencies operate in an effective and efficient manner, and the work of these agencies inevitably suffers from the inefficiency, incompetence, mismanagement or other work-related misfeasance of its employees. Indeed in many cases, public employees are entrusted with tremendous responsibility, and the consequences of their misconduct or incompetence to both the agency and the public interest can be severe.... The delay in correcting the employee misconduct caused by the need for probable cause rather than reasonable suspicion will be translated into tangible and often irreparable damage to the agency's work, and ultimately to the public interest.
O'Connor v. Ortega ___ U.S. at ___, 107 S.Ct. at 1502, 94 L.Ed.2d at 727 (plurality opinion). The risk to public safety inherent in alcohol or drug abuse by transportation employees is obvious; one chemical-induced accident could result in death or serious injury to dozens of passengers. This interest in safety must be weighed against the employee's expectation of privacy, which the court has noted is both legitimate and reasonable. Yet on balance, alcohol and drug testing of employees in jobs directly related to mass transportation constitutes one of "those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable...." T.L.O., 469 U.S. at 351, 105 S.Ct. at 749, 83 L.Ed.2d at 749 (Blackmun, J., concurring).
Dispensing with these traditional requirements is only the beginning of the inquiry as to whether STA's mandatory testing program is constitutional. The Fourth Amendment prohibits "unreasonable" searches and seizures. Determining what is reasonable under the circumstances in this case requires balancing the nature and quality of the intrusion of the employee's expectations of privacy against the importance of STA's legitimate interest in conducting the search. See O'Connor v. Ortega, ___ U.S. at ___, 107 S.Ct. at 1499, 94 L.Ed.2d at 724; United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110, 118 (1983); Illinois v. Lafayette, 462 U.S. 640, 644, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65, 70 (1983). "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447, 481 (1979).
In applying that balancing test to the facts of this case, this court concludes that STA's random testing procedure is unreasonable to the extent that it authorizes drug and alcohol testing on less than reasonable suspicion.[4] Central to this analysis and conclusion is that the Agency has not demonstrated any problem of substance abuse at STA. Further, the Agency only employs 50 people and this small group can be monitored by a less draconian program than that presented here.
With regard to the scope of the intrusion, the court reiterates that public employees have a privacy interest in bodily waste. Furthermore, "[t]he act itself, totally apart from what it may reveal, is traditionally private.... In addition, society has generally condemned and prohibited the act in public." Capua v. City of Plainfield, 643 *1569 F.Supp. 1507, 1514 (D.N.J.1986). Yet the urinalysis procedure in this case, though intrusive, is not on a qualitative par with blood tests, body cavity inspections or strip searches, for which the Supreme Court has traditionally required probable cause.
Nor is the manner in which STA's procedure is conducted quite as intrusive as the one employed in Capua, where Judge Sarokin authorized the testing of police and fire fighters based on individualized reasonable suspicion. In that case, the public employees were forced to urinate in the physical presence of a government agent. Under STA's program, in contrast, employees urinate in a private restroom and are known to the laboratory technician only by an identification number. Nevertheless, both the Agency's program and the one scrutinized in Capua allowed testing on a wholly random basis.
The agency attempts to justify this intrusion on three grounds: first, the promotion of public safety; second, its interest in the health and rehabilitation of STA employees; and third, the promotion of its image and the resulting increased confidence by the public. Although each of these goals are important, protecting the public safety stands out as paramount.
As noted earlier, the public interest in safe mass transportation constitutes a "special need" sufficient to justify a loosening of the usual probable cause standard for chemical testing. However significant this interest might be, it is still outweighed by the Fourth Amendment principle that the decision to conduct a search and seizure should not be "subject to the discretion of the official in the field." Camara v. Municipal Court, 387 U.S. 523, 532, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930, 937.
On balance, random alcohol and drug tests, even for public transportation employees, provide officials with too much discretion to be reasonable under the Constitution. The interests of safety, employee welfare and workplace efficiency can still be served by limiting testing to cases in which reasonable suspicion, based on articulable facts and reasonable inferences drawn from those facts, exists.
A different conclusion is not required because the officials making the random searches in this case are employers and not law enforcement officials. This court rejects STA's argument that "any public agency must be entitled to the same latitude ... as a private employer with regards to searches and seizures of its public employees...." Opposition at 21. The test of reasonableness under the Fourth Amendment already encompasses the difference between government as employer and government as sovereign.
For better or for worse, the process of drawing the line of reasonableness of a search and seizure becomes a subjective analysis of objective factors. In this case, the court concludes that random searches and those based on reasonable suspicion lie on different sides of that line.

B. Procedural Due Process

The Union also alleges that STA's drug-testing program violates the "procedural" aspect of the Due Process Clause of the Fourteenth Amendment. It argues that it would be "fundamentally unfair" to terminate an employee's vested property right in continued public employment on the basis of unreliable drug-testing results.
ATU correctly asserts that permanent public employees who may only be discharged for just cause cannot be terminated without due process. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The question thus becomes whether STA's method and procedure in determining drug usage is so unreliable that public employees may not be constitutionally disciplined under it. Unfortunately, the answer depends heavily on scientific data that is either controverted, contradictory or insufficient in the present record.
The parties predictably argue about the reliability of the EMIT test, which is the first level of chemical analysis under the program. STA maintains that the EMIT test is approximately ninety-five percent accurate. The Union points to expert testimony from a recent drug testing case that *1570 "[t]he EMIT screen suffers from limitations on its reliability." National Treasury Employees Union v. Von Raab, 649 F.Supp. 380, 389 (E.D.La.1986), rev'd., 816 F.2d 170 (5th Cir.1987), petition for cert. filed, 55 U.S.L.W. 3820 (June 8, 1987).
The district court in Von Raab held that the Customs Services' testing procedure violated due process, because of the unreliability in chemical analysis and the potential for mistakes in sample labeling or handling.[5] The Union has not alleged any facts regarding the latter problem. As to to chemical accuracy, STA distinguishes Von Raab on the ground that the EMIT test in its program is backed up by two more levels of urinalysis that are "100% reliable." Opposition at 32. In addition to the questionable scientific accuracy of this statement, STA's papers conflict as to what kind of tests are used at the second and third levels.
According to the Substance Impairment Policy, level two involves a "reflex" test and level three a "thin-layer chromatography" ("TCL") test. However, in its opposition memorandum, STA states that the TCL test is conducted at the second level of analysis and that a "gas chromatography/mass spectrometry" ("GC/MS") test at the third. Since the GC/MS is the most accurate test currently available, clarification on which tests comprise STA's program is crucial to the reliability question and the procedural due process issue.
Some courts have held that the use of the EMIT test alone was sufficiently reliable to satisfy due process. See Jensen v. Lick, 589 F.Supp. 35 (D.N.D.1984) (single test); Smith v. State, 250 Ga. 438, 298 S.E.2d 482 (1983) (single test); Wykoff v. Resig, 613 F.Supp. 1504 (N.D.Ind.1985) (two EMIT tests); Peranzo v. Coughlin, 608 F.Supp. 1504 (S.D.N.Y.1985) (two EMIT tests). C.f., Higgs v. Wilson, 616 F.Supp. 226 (W.D.Ky.1985) (one EMIT test). In light of the confusion in the present record, however, and this court's prior determination that STA's random program is unreasonable under the Fourth Amendment, the court does not reach the question of whether the program also violates the Due Process Clause of the Fourteenth Amendment.

C. Compelled Self-Incrimination

The Union contends that STA's mandatory random drug-testing program constitutes compelled self-incrimination and is unconstitutional under the Fifth Amendment. However, Supreme Court precedent indicates that neither the taking of a urine sample nor the information required in the C of C form violate the Self-Incrimination Clause.
These two pieces of "evidence" may be analyzed separately. Schmerber v. California precludes any argument that the sample implicates the Fifth Amendment prohibition. In Schmerber, the Court held:
the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, and that the withdrawl of blood and use of the analysis [against an accused drunk driver] did not involve compulsion to these ends.
Schmerber v. California, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830-31, 16 L.Ed.2d 908, 914 (1966). The taking of a urine sample is no more "testimonial" in nature than the blood test in Schmerber, the handwriting exemplar in Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), or the voice sample in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). This court joins those lower federal and state courts which have held that urinalysis results constitute "physical" evidence that is outside the *1571 scope of the Fifth Amendment. See, e.g., Walters v. Secretary of Defense, 725 F.2d 107, 108 n. 1 (D.C.Cir.1983); United States v. Nesmith, 121 F.Supp. 758, 762 (D.D.C. 1954); City of Palm Bay v. Bauman, 475 So.2d 1322, 1324 (Fla.Dist.Ct.App.1985).
The Union also claims that STA's requirement that employees submit a written Chain of Custody form with their urine sample violates the Fifth Amendment. By forcing the employee to list any drugs taken in the previous two weeks, ATU argues that STA has conditioned continued public employment on mandatory self-incrimination. Even assuming, arguendo, that this information constitutes "testimony" within the meaning of the Fifth Amendment, this argument also must fail.
In California v. Byers, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), respondent challenged the constitutionality of the state's "hit and run" statute, which required drivers involved in accidents to stop at the scene and give their names and addresses. Chief Justice Burger, writing for a four-member plurality, denied the claim, in part because the information required under the statute simply was not "incriminating" according to the Fifth Amendment: "In order to invoke the privilege it is necessary to show that the compelled disclosures will themselves confront the claimant with `substantial hazards of self-incrimination.'" Byers, 402 U.S. at 429, 91 S.Ct. at 1538, 29 L.Ed.2d at 18 (quoting United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed.2d 1037 (1927)). Justice Harlan, concurring in Byers, joined the plurality on this issue.
Likewise, the public employees are not faced with "substantial hazards of self-incrimination" when the Agency employs mandatory drug testing. Although those tested are required to disclose drugs and medication recently taken, none of the substances listed on the C of C is illegal when prescribed by a doctor. An employee would admit he used illegal "hard drugs" only if he filled in a category listed on the C of C form as "Other." Yet even if an honest employee did list an illegal, controlled substance, the Self-Incrimination Clause would not be implicated, because no criminal sanction could possibly attach under the present STA program.
In the Substance Impairment Policy, STA has warned employees that "[t]he illegal use, sale or possession of narcotics drugs, or controlled substances while on the job or on SunLine property is a dischargeable offense. Any illegal substances will be turned over to the appropriate law enforcement agency and may result in criminal prosecution." Exhibit A at 3. However, this policy appears to be limited to turning over contraband or other tangible evidence of drug use, and in no way suggests that information contained on the confidential C of C form will be disclosed to the authorities.
Moreover, a penalty for compelled disclosure short of criminal sanction, such as job loss, which may violate due process, does not implicate the Self-Incrimination Clause. See Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956).

D. Right to Privacy

Finally, the Union advances a cursory argument that STA's testing program violates the constitutional right to privacy of the employees. ATU fails to state the textual source of this independent privacy right and does not define the scope of protection provided by it.
Instead, the Union cites Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) to support the existence of such a right. It then merely concludes that "[s]uch privacy rights are clearly violated" when chemical tests disclose off-duty conduct unrelated to employment, and employees are required to provide personal information unrelated to determining on-duty alcohol or drug use. Plaintiff's Memorandum at 8. Although the court recognizes that STA's program implicates legitimate "privacy" interests, it concludes that these interests do not rise to the level of an independent fundamental right.
As discussed in Part A, the Fourth Amendment protects an individual's reasonable *1572 expectation of privacy from arbitrary governmental searches and seizures. The "privacy" rights of the public employees have been vindicated under the Fourth Amendment by this court's determination that STA's random program is unreasonable. To find that the testing procedure implicates a further, separate protection would require an expansive reading of the Fourteenth Amendment that this court is unwilling to undertake.
In Griswold and Roe, the Supreme Court construed the Due Process Clause as conferring a fundamental individual right to decide "whether or not to beget or bear a child." Carey v. Population Services International, 431 U.S. 678, 684-85, 97 S.Ct. 2010, 2016-17, 52 L.Ed.2d 675, 684-85 (1977). The Supreme Court recently rejected that those cases, and others involving family relationships, marriage or procreation, announced a broad constitutional right to privacy. To the contrary, Justice White stated:
The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution.... There should be, therefore, great resistance to expand the substantive reach of [the Due Process] Clauses, particularly if it requires redefining the category of rights deemed to be fundamental.
Bowers v. Hardwick, 478 U.S. ___, ___, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140, 148 (1986).
It is unclear whether the Union claims that STA's actual testing methods, including chemical analysis of a urine sample and a C of C form, violate the right to privacy. If so, those claims have already properly been addressed under search and seizure, procedural due process and self-incrimination analysis. This court rejects any contention that a public transportation employee has a fundamental constitutional right to use illegal drugs off-duty.
NOTES
[1] On April 21, 1987, while the motion for a preliminary injunction was under submission, the Union ratified a new CBA. The new CBA is effective from April 1, 1987 through March 31, 1990. The parties have not lodged the new CBA with this court. Thus, the court cites to declarations for relevant provisions of the new CBA. Where the language remains unchanged, the court cites to the parties' prior CBA.
[2] Papers filed by the Union indicate that it opposes only mandatory random alcohol and drug testing. Because ATU did not object to the other types of testing included in the Substance Impairment Policy until oral argument, the court does not address the validity of mandatory pre-employment or biannual medical examination testing.
[3] Additionally, the Third Circuit implicitly held that the Fourth Amendment applies to urinalysis in Shoemaker v. Handel, 795 F.2d 1136, 1142 (3d Cir.1986).
[4] The court does not determine whether individualized suspicion is constitutionally required in all cases under the overall reasonableness standard adopted for chemical testing of public transportation employees. See T.L.O., 469 U.S. at 342 n. 8, 105 S.Ct. at 744 n. 8, 83 L.Ed.2d at 735 n. 8. However, this court can conceive of certain mass-transit settings where mandatory drug and alcohol testing would be reasonable under a more generalized quantum of proof. Individualized suspicion, though a usual prerequisite, is not an "irreducible requirement" of the Fourth Amendment, United States v. Martinez-Fuerte, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). Mandatory drug and alcohol testing based on a generalized reasonable suspicion standard would only be appropriate where the search implicated minimal privacy interests and where "other safeguards" were available to ensure that the employee's expectation of privacy was "`not subject to the discretion of the official in the field.'" Delaware v. Prouse, 440 U.S. 648, 654-55, 99 S.Ct. 1391, 1396-97, 59 L.Ed.2d 660, 668 (1979) (citation omitted); see also Banzhaf, How to Make Drug Tests Pass Muster, Nat'l L.J., Jan. 12, 1987, at 13.
[5] A divided Fifth Circuit panel reversed the district court and held that mandatory, random drug testing was a reasonable search and seizure under the Fourth Amendment. Von Raab, 816 F.2d 170. The majority held that "[t]he drug testing program is not so unreliable as to violate due process of law." Von Raab, 816 F.2d at 181. This court can still rely on expert testimony that the EMIT test lacks reliability. In fact, the Fifth Circuit found that the presence of a follow-up gas chromatography/mass spectrometry test determinative in holding that mandatory drug testing did not violate due process. See Von Raab, 816 F.2d at 181.