Cynthia SCHNEBLE, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

No. C–3–84–951.

United States District Court, S.D. Ohio, W.D.

March 13, 1985.

Richard W. Divine, Dayton, Ohio, and Alfred W. Schneble, III, Kettering, Ohio, for plaintiff.

Gerald Kaminski, Asst. U.S. Atty., Dayton, Ohio, for defendants.

## DECISION AND ENTRY DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; DISSOLUTION OF TEMPORARY RESTRAINING ORDER; PLAINTIFF'S MOTION FOR PROTECTIVE ORDERS OVERRULED; FURTHER PROCEDURES SET

RICE, District Judge.

## I. FACTS

A medical student selected to participate in the Armed Services Health Professions Scholarship Program (HPSP), 10 U.S.C. § 2120 *et seq.*, is commissioned as an officer in the reserve component of a branch of the armed services while he or she is still in school. The Department of Defense may pay all of a participant's educational expenses, including tuition, as well as paying each participant a monthly stipend. In exchange for these benefits, an HPSP participant incurs certain obligations, among them being an active duty obligation of at least one year in the appropriate branch of the armed services for each year of participation in the HPSP.

Plaintiff, Cynthia Schneble, signed an HPSP contract with the United States Air Force on July 11, 1978 (Doc. # 21, Exh. A), and began a four-year medical degree program at Wright State University on September 5, 1978. Plaintiff completed two years of her medical education, and was then granted a leave of absence from the HPSP for the period from July 8, 1980, to July 1, 1981. She received no benefits under the HPSP during this leave of absence.

Subsequent to her return from her initial year-long leave, health problems prompted Plaintiff to take two additional leaves of absence—from November 1, 1981 to January 4, 1982 and from August 1, 1982 to September 1, 1982—from Wright State. In August or September, 1982, Plaintiff learned that the Air Force, under its reading of pertinent HPSP regulations, had prorated her tuition for the two quarters affected by these latter two leaves of absence, by paying her tuition only for the time she actually spent in school during those semesters, thus leaving Plaintiff with an outstanding balance of tuition owed to Wright State. Plaintiff took out a loan of $863 from Wright State to pay her outstanding tuition balance. She simultaneously informed officials of the Air Force Institute of Technology (AFIT), which monitors HPSP participants while they are in medical school, of her belief as to the responsibility of the Air Force to pay the portion of her tuition which had been left outstanding.

By the fall of 1982, AFIT officials had begun speculation that Plaintiff's chronic lack of communication as to her status in medical school, coupled with other infractions, made her a candidate for withdrawal from the HPSP. Plaintiff's participation in the program, however, continued in 1983. Plaintiff failed to repay her $863 loan from Wright State when it became due in March of 1983. As a result, although Plaintiff completed the academic requirements for her medical degree in July, 1983, and began a one-year medical internship at Kettering Medical Center during that same month, Wright State refused to issue Plaintiff's diploma due to her outstanding financial obligations.

Plaintiff's correspondence with AFIT officials in the first half of 1983 continued to reflect her belief as to their responsibility for the amount of the disputed tuition. She also indicated repeatedly to AFIT that the date of her receipt of her medical degree remained uncertain, perhaps as late as January, 1984, due to academic as well as financial considerations. Plaintiff began to communicate with AFIT solely through her lawyer in November, 1983. Not surprisingly, AFIT officials continued to discuss

80

throughout 1983 Plaintiff's possible withdrawal from the HPSP.

Plaintiff's inability to tell the Air Force when she would receive her medical degree had further implications with respect to her relationship with the Air Force Manpower and Personnel Center (AFMPC), the branch of the Air Force which monitors the graduate medical education of Air Force physicians. Typically, an HPSP participant begins his or her active duty commitment with the Air Force after completing a year-long internship subsequent to receipt of the medical degree, unless further deferment is requested.

Plaintiff was initially scheduled to begin her active duty obligation in July, 1984. Communication between AFIT officials and AFMPC officials, however, left the AFMPC unclear as to when Plaintiff would receive her medical degree and complete her internship. Plaintiff failed, moreover, to respond to a series of AFMPC requests from April, 1983 on to submit applications with respect to her plans for graduate medical education. Coupled with those requests from AFMPC was a warning that Plaintiff's failure to respond could result in a deferment of her active duty obligation to July, 1985. By November, 1983, Plaintiff still had not been awarded her degree from Wright State. Nor had she informed the Air Force that she was already enrolled in an internship program. As a result of her failure to respond, and in the belief that Plaintiff would require additional time to complete the prerequisites for active duty, Major John Sheehan of the AFMPC informed Plaintiff on November 15, 1983, that her active duty obligation was deferred until July, 1985. (Doc. # 21, Exh. E).

After an initial flurry of communications following Major Sheehan's letter, Plaintiff's attorney did not respond to the efforts of AFIT officials from mid-January, 1984, through May, 1984, to settle Plaintiff's medical school situation as well as her status as an HPSP participant. Plaintiff's involuntary separation from the HPSP was discussed with increasing frequency by

AFIT officials as a result. In May, 1984, AFIT proposed that Plaintiff either immediately rectify the situation with Wright State, receive her degree, and be called to active duty, or that she seek voluntary separation from the Air Force. Plaintiff showed interest in the latter option, and her attorney began negotiations on May 15, 1984, to secure Plaintiff's voluntary resignation from active duty participation.

At the end of May, 1984, AFIT officials alerted the AFMPC that Plaintiff had in fact completed the requirements for her medical degree and that she was enrolled in a one-year internship which would terminate on July 31, 1984. On June 7, 1984, Colonel McGough of AFIT, acting at the direction of Colonel Mauk of the AFMPC, contacted Plaintiff by telephone at Kettering Memorial Hospital. Colonel McGough suggested to Plaintiff that the dispute as to Plaintiff's prorated tuition be resolved in Plaintiff's favor. His offer to Plaintiff was that the Air Force pay Plaintiff's outstanding loan to Wright State—which by that time was the subject of a lawsuit by Wright State against Plaintiff—in return for additional months of active duty service on Plaintiff's part equal to the length of time which had comprised her second and third leaves of absence from medical school, which the Air Force was then offering to pay. Plaintiff did not accept Colonel McGough's proposal, but referred him to her attorney.

In a letter to Plaintiff dated June 11, 1984, Colonel Mauk himself urged Plaintiff to settle her account with Wright State. Acknowledging the earlier offer made to Plaintiff by Colonel McGough, Colonel Mauk informed Plaintiff that, whether or not she accepted that proposal, the tuition dispute would not stand in the way of Plaintiff's being called to active duty. (Doc. # 21, Exh. B). In a subsequent letter of July 31, 1984, Colonel Mauk informed Plaintiff's attorney that, notwithstanding AFIT's earlier suggestion that Plaintiff voluntarily separate from the Air Force, Plaintiff's resignation would not be an acceptable resolution of the situation. He stated

that the Air Force was in the process of settling Plaintiff's account with Wright State, and that Plaintiff's orders to active duty would be issued promptly.

On August 8, 1984, the Air Force paid off Plaintiff's loan from Wright State, including all late fees. The lawsuit by Wright State against Plaintiff for repayment of the loan was subsequently terminated. On August 14, 1984, Plaintiff was finally awarded her medical degree from Wright State. On August 17, 1984, Extended Active Duty Orders were issued to Plaintiff, directing her to appear at Sheppard Air Force Base in Texas on September 8, 1984. These orders were later returned by the United States Post Office as unclaimed. On August 20, 1984, Plaintiff tendered a formal letter of resignation to the Air Force.

A second set of Extended Active Duty Orders, directing Plaintiff's appearance at Sheppard Air Force Base, with end assignment to Grissom Air Force Base, Indiana, was hand-carried to Plaintiff on September 26, 1984. Like the earlier August 17th set of orders, the September 26, 1984 orders indicated that the term of Plaintiff's extended active duty was 54 months, rather than the 48 months called for under Plaintiff's HPSP contract. Plaintiff failed to appear at either Sheppard or Grissom Air Force Base as called for in the second set of orders.

Due to her failure to comply with her orders, Plaintiff was placed in an absence without leave (AWOL) status on October 23, 1984, with an effective date of October 9, 1984. On November 6, 1984, Plaintiff's attorney alerted the AFMPC to the error in Plaintiff's orders with respect to the length of her active duty service. Plaintiff's active duty service was accordingly recalculated on the basis of new documentation not previously in Plaintiff's file, and the

error was admitted by the AFMPC. Based on the revised calculations, on November 7, 1984, the Air Force issued an amendment to Plaintiff's Extended Active Duty Orders of September 26, 1984, indicating that Plaintiff's active duty commitment was in fact 48 months rather than 54 months. The amendment was forwarded to Plaintiff through her attorney.

The Air Force changed Plaintiff's status to that of a deserter on November 8, 1984. On November 16, 1984, Plaintiff filed her suit in this Court, seeking damages, declaratory relief, and rescission (Doc. # 1), and filed motions seeking a temporary restraining order and preliminary injunction. (Docs. # 2, 3). On November 19, 1984, a military pick-up order was issued for Plaintiff's arrest. On November 20, 1984, this Court sustained Plaintiff's Motion for a Temporary Restraining Order (Doc. # 2), directing that Defendants refrain from executing the military pick-up order or subjecting Plaintiff to any proceedings under the Uniform Code of Military Justice for a period of ten days. (Doc. # 4). On December 10, 1984, upon agreement of counsel, this Court extended its Temporary Restraining Order until the time of its ruling on Plaintiff's Motion for Preliminary Injunction. (Doc. # 12).

## II. SUBJECT MATTER JURISDICTION

■ Defendants do not dispute that the Tucker Act, 28 U.S.C. § 1346(a), affords this Court subject matter jurisdiction over Plaintiff's claim for damages stemming from Defendants' alleged breach of her HPSP contract. Their position is, rather, that this Court lacks jurisdiction over Plaintiff's claim for injunctive and declaratory relief. Upon scrutiny of the potential jurisdictional bases for Plaintiff's equitable claims,[1] however, this Court is persuaded that said claims "arise under" the laws of

---

1. Some circuit courts have intimated that the Tucker Act may empower a district court to award equitable relief in the narrow circumstance where it is merely incidental to and in aid of a primary request for monetary damages. *Sheehan v. Army and Air Force Exchange Service,* 619 F.2d 1132, 1138 n. 10 (5th Cir.1980);

*Werner v. U.S. Dept. of Interior, Fish and Wildlife,* 581 F.2d 168, 171 (8th Cir.1978); *Larionoff v. United States,* 533 F.2d 1167, 1181 (D.C.Cir. 1976). In the present action, however, Plaintiff's claim for damages is clearly incidental to her primary quest for injunctive relief, rescission and declaratory relief.

the United States within the meaning of 28 U.S.C. § 1331, the "federal question" statute.

The HPSP was established by Congress for the purpose of obtaining an adequate number of commissioned officers for active duty who are qualified physicians or other health professionals. 10 U.S.C. § 2121(a). The statutory scheme utilized to implement this goal, 10 U.S.C. § 2120 *et seq.*, sets forth the obligations and duties of each HPSP participant as well as the responsibilities of the relevant armed services branch towards a complying HPSP participant. It further requires that each HPSP participant sign an agreement with the United States that summarizes these reciprocal statutory burdens and benefits. 10 U.S.C. § 2122(2). As noted previously, Plaintiff signed an HPSP contract with Defendant United States Air Force on July 11, 1978.

Defendants emphasize that Plaintiff's action herein is merely a suit for breach of contract and as such is outside the jurisdiction of this Court. Yet, plainly, the agreement between Plaintiff and Defendant United States Air Force is closely intertwined with, if not inseparable from, the federal statutory scheme described above. *Local Div. 1285, Etc. v. Jackson Transit Auth.*, 650 F.2d 1379, 1382 (6th Cir.1981), *rev'd on other grounds*, 457 U.S. 15, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982). The HPSP contract is the mandatory vehicle for preserving and furthering the rights and obligations so created by Congress. *Id.* As the rights asserted by Plaintiff herein derive from these federal statutes, Plaintiff's claim must be found to "arise under" the laws of the United States, as required for federal jurisdiction under 28 U.S.C. § 1331. *Accord Allen v. Weinberger*, 546 F.Supp. 455 (E.D.Mo.1982); *Mansfield v. Orr*, 545 F.Supp. 118 (D.Md.1982); *Acko v. Brown*, 489 F.Supp. 216 (D.Minn.1980).[2]

■ The Court is also not persuaded by Defendants' argument that the Court should refrain from reaching the merits of the instant case on the basis of the doctrine

in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). There were no pending court-martial proceedings against Plaintiff when she sought injunctive relief from this Court, unlike the situation which compelled application of the *Younger* doctrine in *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). Nor has the Court been alerted to any prosecutorial process which might render at all analogous herein the case of *Hicks v. Miranda*, 422 U.S. 332, 349, 95 S.Ct. 2281, 2291, 45 L.Ed.2d 223 (1975), which held that *Younger* is applicable when state criminal proceedings are begun against the federal plaintiff, after the filing of the complaint, but before any proceedings of substance on the merits. In sum, the Court concludes that it has subject matter jurisdiction in the instant case and that it may proceed accordingly with a resolution on the merits of Plaintiff's Motion for Preliminary Injunction.

### III. PLAINTIFF'S ENTITLEMENT TO PRELIMINARY INJUNCTIVE RELIEF

■ As noted by the Sixth Circuit in *Warner v. Central Trust Co., N.A.*, 715 F.2d 1121 (6th Cir.1983), four factors are to be considered by the district court in exercising its discretion to grant a preliminary injunction, namely:

(1) Whether the Plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

(2) Whether the Plaintiff has shown the threat of irreparable injury(ies);

(3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

(4) Whether the public interest would be served by issuing a preliminary injunction.

715 F.2d at 1123.

### A. *Probability of Success on the Merits*

■ The Court has found considerable federal authority to the effect that tradi-

---

**2.** Defendants have acknowledged that 5 U.S.C. § 702 waives the defense of sovereign immunity in actions for non-monetary relief under 28

U.S.C. § 1331. *Warin v. Director, Dep't of Treasury*, 672 F.2d 590, 591 (6th Cir.1982).

tional principles of contract law are applicable to claims that an enlistment contract is invalid or has been breached. *Pence v. Brown*, 627 F.2d 872, 874 (8th Cir.1980); *Peavy v. Warner*, 493 F.2d 748, 750 (5th Cir.1974). Application of such contract principles firmly persuades this Court as to Plaintiff's almost total lack of probability of success on the merits of this case. Having scrutinized Plaintiff's allegations as to the various means by which Defendants breached her enlistment contract, this Court finds itself unable to agree that Defendants in fact committed a breach of the contract.

■ Plaintiff's theory as to Defendants' breach in the First Claim for Relief, contained in her Second Amended Complaint, turns on the Defendants' allegedly unlawful proration of her tuition and the links which said proration had to the fifty-four month active duty requirement contained in her September 26, 1984 Extended Active Duty Orders. This Court finds that Defendants reasonably construed the language of the enlistment contract as well as the government AFIT Regulations, particularly AFIT Regulation 53–7, Par. 4–10, to the effect that it could prorate an HPSP participant's tuition expenses for those portions of the academic term during which a participant enjoyed a leave of absence and was hence not an "active" HPSP participant. Colonel Mauk's letter of June 11, 1984, was thus, at most, reflective of an offer by Defendants to modify Plaintiff's contract for the consideration stated, namely, payment of the disputed tuition. Moreover, the deposition of Franklin L. Fisher persuades the Court that the initial determination of Plaintiff's active duty commitment as 54 months rather than 48 months was a clerical error due in no small part to Plaintiff's own inability to keep Defendants properly abreast of the status of her medical education. Once alerted to the mistake, Defendants amended Plaintiff's orders to reflect a 48 month commitment, even though the Air Force had already paid off

Plaintiff's outstanding tuition balance to Wright State.

Nor is this Court any more persuaded as to Plaintiff's probability of success on the merits of her Second Claim for Relief. The facts in this case reveal Plaintiff's own failure to abide by Air Force regulations and requests for information and applications pertaining to her plans for graduate medical education. The facts further reveal the confusion of officials of AFIT, in turn communicated to AFMPC officials, as to Plaintiff's date of graduation from medical school, due largely to Plaintiff's own communications and lack thereof. Plaintiff was put on notice that without proper processing and information, her active duty obligation stood to be deferred until July, 1985. This Court thus finds it difficult to construe Plaintiff's deferment from active duty, as reflected by Major Sheehan's November 10, 1983 letter, as constituting an actual breach by Defendants.

■ Even assuming that Defendants had breached their contract with Plaintiff, the Court does not find that rescission, the primary relief sought by Plaintiff, would be proper. In order for a court to find grounds to order the equitable remedy of rescission, a breach must be found so substantial and fundamental as to go to the very root of the contract. *United States v. Southern Construction Co.*, 293 F.2d 493, 498 (6th Cir.1961). In this case, even assuming, *arguendo*, a breach of the contract, such a breach would be minor, negligible, and *de minimis*. Plaintiff elected to forego rescission upon learning of Defendants' proration of her tuition in the early fall of 1982, and continued to receive the benefits of the contract through July, 1983.[3] It would be unconscionable (not to mention inequitable), even assuming that Defendants' conduct rose to the level of a breach, to award rescission in such a situation as this.

In sum, the Court finds that Plaintiff has not established any probability of success on the merits. While this finding alone

---

**3.** Indeed, Plaintiff continued to receive an HPSP stipend through November 3, 1983, due to the

confusion as to the date of her completion of requirements for the medical degree.

would permit this Court to deny Plaintiff's Motion for Preliminary Injunction, the Court will briefly consider the remaining portions of the four-part test outlined in *Warner* for purposes of completing the record.

### B. *Irreparable Injury to Plaintiff*

While continued performance of her enlistment contract, entailing at this stage a report for active duty at Grissom Air Force Base in Indiana, may well prove inconvenient for Plaintiff, this Court finds no irreparable injuries sufficient to merit the granting of injunctive relief. Any damages suffered by Plaintiff are easily quantifiable. In short, this factor also militates against the granting of the preliminary injunction sought by Plaintiff.

### C. *Substantial Harm to Others*

The Court finds that the equities in this case strongly favor Defendants and, indeed, that the pursuit of injunctive relief by Plaintiff borders on the fraudulent. The government spent tens of thousands of dollars fulfilling its obligations to Plaintiff while she was in medical school. Now that Plaintiff has completed her medical education and internship and is in a position to begin to fulfill her obligations under the HPSP program to serve as an Air Force physician, Defendants would be substantially harmed by Plaintiff's procurement of an injunction from this Court to stymie her active duty commitment. Defendants have pointed to the current shortage of physicians at Grissom Air Force Base, to which Plaintiff has been ordered to report, and the strain which Plaintiff's refusal to report for active duty has created for other personnel, both enlisted and medical, at said air force base. The Court concludes that issuance of a preliminary injunction in the instant case would indeed cause substantial harm to others.

### D. *Public Interest*

In establishing the HPSP, Congress made the judgment that tax dollars would be well spent in training individuals in the health professions in order to overcome the shortage of health care professionals in the military. To allow Plaintiff to avoid her obligations under the HPSP contract at this point in her medical career would be a grave disservice to the end which the HPSP is designed to serve, and would in no small way violate the public trust.[4] This Court plainly cannot find that the public interest would be served by issuing Plaintiff the injunctive relief which she seeks.

For the reasons aforesaid, Plaintiff's Motion for Preliminary Injunction (Doc. # 3) is overruled. Plaintiff's Motion for Temporary Restraining Order (Doc. # 2), sustained on November 20, 1984 and extended on December 12, 1984 until the date of this decision, is hereby dissolved.

### IV. PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

In her Motion for Protective Orders (Doc. # 27), filed after the Court's oral ruling on her Motion for Preliminary Injunction, Plaintiff seeks the Court's continued involvement in her relationship with Defendants. For the reasons outlined in this opinion, the Court believes that there has been no breach by Defendants in this matter, and that Plaintiff is contractually obligated to discharge to Defendants the remainder of her duties as outlined in the HPSP contract. This Court thus overrules Plaintiff's Motion for Protective Orders in its entirety, and refuses to grant in the guise of a Protective Order any or all of the relief

---

4. The Court's conclusion with respect to the public interest in the issuance of the injunction sought by Plaintiff, and indeed with respect to the substantial harm caused to others by any such injunction, is not altered by Plaintiff's tender to this Court of a cashier's check in the sum of $12,828.93 at the time of her filing of her original Complaint. Plaintiff contends that this sum represents "the full amount of expenses paid out by Defendant United States for the Plaintiff's medical education." (Doc. # 1). What Plaintiff fails to mention, however, is that she has also received $26,662.82 in stipend and non-education related expenses under the HPSP program. (Doc. # 17, at 32). On February 1, 1985, by order of this Court, a check in the sum of $12,828.93 was issued by the Clerk of Courts, payable to Plaintiff's trial counsel. (Doc. # 26).

which it herein refuses to issue in the form of an injunction.

## V. FURTHER PROCEDURES SET

Upon the parties' receipt of this Decision and Entry dissolving the earlier-issued Temporary Restraining Order in this matter and denying Plaintiff's Motion for Preliminary Injunction and Motion for Protective Orders, a telephone conference call with the parties will be convened to discuss the status of this litigation. Said conference call will be held at 4:15 p.m. on Thursday, March 21, 1985.