[Cite as *Indep. Phlebotomy & Health Servs., L.L.C. v. Croston*, 2024-Ohio-2349.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| INDEPENDENT PHLEBOTOMY<br>& HEALTH SERVICES, LLC, | : | JUDGES:<br>Hon. Patricia A. Delaney, P.J.<br>Hon. Craig R. Baldwin, J.<br>Hon. Andrew J. King, J. |
| Plaintiff - Appellant | : | |
| -vs- | : | |
| STEVEN CROSTON, et al., | : | Case No. 2023CA00122 |
| Defendants - Appellees | : | O P I N I O N |

CHARACTER OF PROCEEDING:          Appeal from the Canton Municipal
                                 Court, Case No. 2023-CVF-00477

JUDGMENT:                        Affirmed

DATE OF JUDGMENT:                June 18, 2024

APPEARANCES:

For Plaintiff-Appellant                For Defendants-Appellees

KEVIN J. BREEN                         JOEL BLUE
Kevin J. Breen Co., LLC                6820 Mapleridge Circle., NW
3500 West Market Street, Suite 4       Canton, Ohio 44718
Fairlawn, Ohio 44333

*Baldwin, J.*

{¶1}   The appellant appeals the trial court's decision granting the appellees' motion for summary judgment based upon its finding that the parties entered into an employment contract which should be rescinded.

### STATEMENT OF THE FACTS AND THE CASE

{¶2}   The appellant is a limited liability company that conducts "consultative examinations" of disability claimants for submission to the Opportunities For Ohioans With Disabilities Division of Disability Determination (herein, "the OOD DDD"). The OOD DDD processes applications made to the Social Security Administration (SSA) for Disability Insurance (SSDI) and Supplemental Security Income (SSI). The OOD DDD may require consultative examinations of claimants for continued payment of disability benefits and, when required, consultative examinations must be conducted by a medical professional. The appellant hires physicians and other medical professionals to conduct the consultative examinations in the usual course of its business operations.

{¶3}   Appellee Steven Croston is a licensed Physician's Assistant, and his wife Heidi Croston is a licensed Certified Nurse Practitioner. Appellee Steven Croston responded to the appellant's job posting on Indeed.com. The posting stated that the primary duty of the position would be performing consultative examinations. Appellee Steven Croston interviewed for the job, and suggested at the conclusion of his interview that his wife, appellee Heidi Croston, may also be a good fit for the position.  Both appellees executed a document with the appellant entitled Professional Services Agreement (hereinafter "Agreement.")  The appellees entered into the Agreement with the appellant on October 17, 2022, to provide disability examinations for the appellant's

clients pursuant to its contract with the OOD DDD. The Agreement was to commence on November 1, 2022. The Agreement stated that the appellees agreed to schedule, at a minimum, four weekday exams per month within a 12-month period. In addition, the Agreement specified at Exhibit A that "a minimum of 4 weekdays per month are required to be compliant with this contracted agreement." The appellant agreed to pay the appellees $100.00 per completed exam. The appellees were scheduled to begin working on December 6, 2022.

{¶4} The appellant scheduled appointments for the appellees with claimants seeking an examination to determine their eligibility for social security benefits, and scheduled twenty individuals for appellee Steven Croston to examine on December 6, 2022. He arrived at the appellant's office early and began the first exam. There is nothing in the record establishing that the appellees were provided with any supervision from a licensed physician in the exercise of their consultative examination duties, only that the appellant had arranged for the appellees to shadow its resident physician. See, Robinette affidavit, attached to appellant's motion for summary judgment, at paragraph 12.

{¶5} Appellee Steven Croston became concerned during the first exam about issues regarding his ability to perform the examinations within the time-frame scheduled by the appellant, and about licensing and supervision requirements. He met with the appellant in her office after the first exam to express these concerns, and when it was clear that the conditions would remain the same he quit, performing no further work for the appellant. Appellee Heidi Croston learned of the issues her husband had experienced on December 6, 2022, and resigned before attending her first day of work. She performed no examinations on the behalf of the appellant, and performed no other work for the

appellant. Neither appellee received any consideration or payment from the appellant in connection with the Agreement.

**{¶6}** The appellant filed a pro se complaint against the appellees for breach of contract,[1] averring that the appellees were in breach of the Agreement and that it had suffered damages in the amount of $9,690.00 as a result. The appellant thereafter claimed damages in the amount of $10,000.00, and $14,999.00. The appellant's basis for calculating its alleged damages varied as the case proceeded.

**{¶7}** The appellees filed their answer pro se, and argued that the Agreement was in violation of Ohio law because it required them to perform the consultative examinations without the direct supervision of a physician. They later obtained counsel, and argued that, while the Agreement referred to them as independent contractors, they were in fact employees who were free to terminate their employment with the appellant.

**{¶8}** The appellant filed a motion for summary judgment arguing that the appellees were in breach of contract, and that it had suffered damages as a result, attaching the affidavit of Brenda Robinette purporting to support its arguments. The Robinette affidavit reiterated the allegations contained in the complaint and referenced several unauthenticated documents that were attached to the affidavit as exhibits.

**{¶9}** The appellees filed a brief in opposition to the appellant's motion for summary judgment, as well as their own motion for summary judgment, arguing that the contract was not in compliance with Ohio law since it required them to work without the direct supervision of a physician; and, that they were employees who could terminate

---

[1] Brenda Robinette, who filed the complaint pro se on behalf of her business Independent Phlebotomy & Health Services, LLC, was advised by the trial court that representing her business constituted unauthorized practice of law. Attorney Edward Gilbert thereafter entered an appearance on the appellant's behalf.

their employment with the appellant at will. The appellees' brief in opposition/motion for summary judgment relied upon the pleadings as the Civ.R. 56(C) evidentiary quality materials that supported of their arguments. The Robinette affidavit stated only that she had arranged for the appellees to shadow a physician; it contained no reference to a supervision agreement with the physician.

{¶10} The trial court issued a Judgment Entry on August 21, 2023, in which it found that the Agreement was an executory contract in which no party had performed, the appropriate remedy for which was rescission. The trial court denied the appellant's motion for summary judgment and granted the appellees' motion for summary judgment.

{¶11} The appellant filed a timely appeal in which she sets forth the following three assignments of error:

{¶12} "I. THE TRIAL COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT."

{¶13} "II. THE TRIAL COURT ERRED IN FAILING TO DETERMINE THAT APPELLEES WERE INDEPENDENT CONTRACTORS RATHER THAN EMPLOYEES AND IN DETERMINING THAT THE QUESTION OF WHICH STATUS APPLIES IS IRRELEVANT TO THE DETERMINATION OF THE CASE."

{¶14} "III. THE TRIAL COURT ERRED IN ITS DETERMINATION THAT THE PROFESSIONAL SERVICES AGREEMENT BETWEEN APPELLANT AND APPELLEES IS AN EXECUTORY CONTRACT SUCH THAT THE APPROPRIATE REMEDY IS RESCISSION WHEN NEITHER PARTY PLEAD, ARGUED OR SOUGHT RESCISSION AS A REMEDY."

**STANDARD OF REVIEW**

**{¶15}** Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 36, 506 N.E.2d 212. Accordingly, this Court reviews a trial court's award of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

**{¶16}** Civ. R. 56(C) states in pertinent part: "Summary Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ... A summary judgment shall not be rendered unless it appears from such evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." Thus, summary judgment may be granted only after the trial court determines that: 1) no genuine issues as to any material fact remain to be litigated; 2) the moving party is entitled to judgment as a matter of law; and 3) it appears from the evidence that reasonable minds can come to but one conclusion and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977).

{¶17} As this Court recently observed in *Infield v. Westfield Ins. Co.*, 5th Dist. Muskingum No. CT2022-0055, 2023-Ohio-1199: "It is well established that the party seeking summary judgment bears the burden of demonstrating no issues of material fact exist for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment is delineated in *Dresher v. Burt*, 75 Ohio St.3d 280 at 293, 662 N.E.2d 264 (1996): "* * * a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." The record on summary judgment must be viewed in the light most favorable to the opposing party. *Williams v. First United Church of Christ*, 37 Ohio St.2d 150, 309 N.E.2d 924 (1974)." *Id.* at ¶ 21.

**ANALYSIS**

{¶18} We consider the appellant's assignments of error out of order, addressing first its third assignment of error regarding the trial court's finding that the Agreement was executory in nature and therefore subject to rescission.

{¶19} Executory contracts were discussed by the Ohio Supreme Court in the seminal case of *Cassella v. Tiberio,* 150 Ohio St. 27 (1948), and were defined as follows:

> 'An executory contract is one in which a party binds himself to do, or not to do, a particular thing, whereas an executed contract is one in which the object of the agreement is performed and everything that was to be done is done. * * * Another distinction between an executory and an executed contract is that the former requires affirmative action for its establishment, but the latter remains in force until disaffirmed.'

*Id.* at 30.

{¶20} In this case, the appellees entered into an agreement with the appellant which became effective on November 1, 2022, and in which they agreed to schedule, at a minimum, four weekday exams per month over the course of a 12-month period. As consideration, the appellant agreed to pay the appellants $100.00 for each completed exam. The clear terms of the Agreement are conditional upon future acts of the parties – that is, the appellees were required to schedule four exams per month over the course of a twelve month period, and the appellant was required to pay them $100.00 per exam. Appellee Steven Croston started but did not finish one exam, and was not compensated by the appellant. Appellee Heidi Croston did not perform any exams, nor did she receive any compensation from the appellant.

**{¶21}** The District Court for the Northern District of Ohio discussed executory contracts in the case of *In re Bell & Beckwith*, 66 B.R. 703 (N.D. Ohio 1986) as follows:

An executory contract is an agreement under which the obligations of both parties are so far unperformed that the failure of either party to complete performance would constitute a material breach of the contract. *2522 South Reynolds Corp. v. Russell (In re 2252 South Reynolds Corp.),* 33 B.R. 616 (Bankr.N.D.Ohio 1983). Although the SIPA does not specifically define the term "executory contract," generally, as long as any material part of a contract remains unperformed, such contract is executory. See, e.g., *Jenson v. Continental Financial Corp.,* 591 F.2d 477, 481 (8th Cir.1979). An executory contract has also been defined as a contract "where some future act is to be done", as contrasted with an executed contract "where nothing remains to be done by either party." BLACK'S LAW DICTIONARY 292 (rev. 5th ed. 1979). See also *Solomon v. Pacific Telephone and Telegraph Co. (In re U.S. Financial, Inc.),* 594 F.2d 1275, 1280 (9th Cir.1979) (executory contract contemplates rendition of future performance).

*Id.* at 705–706. In this case, all material parts of the Agreement remained unperformed. The appellees had not scheduled four exams within one month, let alone performed them; in fact, appellee Steven Croston had only undertaken one exam, for which it does not appear the paper work was completed, and appellee Heidi Croston had neither scheduled nor performed any exams. Further, the appellant had not paid any compensation to the appellees. As such, the Agreement was an executory contract.

**{¶22}** Rescission is one remedy available in executory contract cases. The remedy of rescission was discussed by the court in *Garofoli v. Whiskey Island Partners, Ltd.*, 2014-Ohio-5433, (8th Dist.):

> "For a court to find grounds to order the equitable remedy of rescission, it must determine the existence of a breach so substantial and fundamental as to go to the root of the contract." *Admiral Holdings, LLC v. Adamany,* 8th Dist. Cuyahoga No. 87870, 2006-Ohio-6945, 2006 WL 3804512, ¶ 6, citing *Schneble v. U.S.,* 614 F.Supp. 78, 83 (S.D.Ohio 1985). In other words, the breach must be material. *See Westlake v. VWS, Inc.,* 8th Dist. Cuyahoga No. 100180, 2014-Ohio-1833, 2014 WL 1775899, ¶ 29, quoting *Marion Family YMCA v. Hensel,* 178 Ohio App.3d 140, 2008-Ohio-4413, 897 N.E.2d 184, ¶ 7 (3d Dist.). ("A 'material breach of contract' is a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform.")

*Id.* at ¶ 43. The consultative exams which were to be performed by the appellees, and the payment for the same, were so fundamental to the Agreement that not performing them defeats the essential purpose of the Agreement. The exams where so substantial as to go the root of the Agreement. Because the foundational component of the Agreement was not performed, it was executory in nature and rescission was an appropriate remedy. Indeed, the appellees' decision to no longer work with the appellant after appellee Steven Croston's experience on December 6, 2022, is indicative of their desire to rescind the Agreement.

{¶23} Furthermore, the Agreement failed to address the issue of physician supervision of the appellees during their consultative examination work for the appellant. There is no evidence contained in the record that a supervision agreement was in place as required by Ohio law, either for appellee Steven Croston, a physician's assistant, or appellee Heidi Croston, a certified nurse practitioner. In fact, the Robinette affidavit states only that the appellees were provided with the opportunity to shadow a physician in preparation for their work for the appellant.

{¶24} R.C. 4730.08 discusses a physician assistant's right to practice, and states in pertinent part:

(A) A license to practice as a physician assistant issued under this chapter authorizes the holder to practice as a physician assistant as follows:

(1) The physician assistant shall practice only under the supervision, control, and direction of a physician with whom the physician assistant has entered into a supervision agreement under section 4730.19 of the Revised Code.

(2) The physician assistant shall practice in accordance with the supervision agreement entered into with the physician who is responsible for supervising the physician assistant, including, if applicable, the policies of the health care facility in which the physician assistant is practicing.

{¶25} R.C. 4730.19 addresses physician assistant supervision agreements, and states:

(A) Before initiating supervision of one or more physician assistants licensed under this chapter, a physician shall enter into a supervision

agreement with each physician assistant who will be supervised. A supervision agreement may apply to one or more physician assistants, but, except as provided in division (B)(2)(e) of this section, may apply to not more than one physician. The supervision agreement shall specify that the physician agrees to supervise the physician assistant and the physician assistant agrees to practice under that physician's supervision.

The agreement shall clearly state that the supervising physician is legally responsible and assumes legal liability for the services provided by the physician assistant. The agreement shall be signed by the physician and the physician assistant.

(B) A supervision agreement shall include either or both of the following:

(1) If a physician assistant will practice within a health care facility, the agreement shall include terms that require the physician assistant to practice in accordance with the policies of the health care facility.

\*       \*       \*

(C) A supervision agreement may be amended to modify the responsibilities of one or more physician assistants or to include one or more additional physician assistants.

(D) The supervising physician who entered into a supervision agreement shall retain a copy of the agreement in the records maintained by the supervising physician. Each physician assistant who entered into the

supervision agreement shall retain a copy of the agreement in the records maintained by the physician assistant.

(E)(1) If the board finds, through a review conducted under this section or through any other means, any of the following, the board may take disciplinary action against the individual under section 4730.25 or 4731.22 of the Revised Code, impose a civil penalty, or both:

(a) That a physician assistant has practiced in a manner that departs from, or fails to conform to, the terms of a supervision agreement entered into under this section;

(b) That a physician has supervised a physician assistant in a manner that departs from, or fails to conform to, the terms of a supervision agreement entered into under this section;

(c) That a physician or physician assistant failed to comply with division (A) or (B) of this section.

(2) If the board finds, through a review conducted under this section or through any other means, that a physician or physician assistant failed to comply with division (D) of this section, the board may do either of the following:

(a) Take disciplinary action against the individual under section 4730.25 or 4731.22 of the Revised Code, impose a civil penalty, or both;

(b) Permit the individual to agree in writing to update the records to comply with division (D) of this section and pay a civil penalty.

(3) The board's finding in any disciplinary action taken under division (E) of this section shall be made pursuant to an adjudication conducted under Chapter 119. of the Revised Code.

(4) A civil penalty imposed under division (E)(1) or (2)(a) of this section or paid under division (E)(2)(b) of this section shall be in an amount specified by the board of not more than five thousand dollars and shall be deposited in accordance with section 4731.24 of the Revised Code.

{¶26} Similar requirements are in place for certified nurse practitioners, and can be found in the Ohio Administrative Code at section 4723-8-04, which provides in pertinent part:

(A) Prior to engaging in practice, a standard care arrangement shall be entered into with each physician or podiatrist with whom the certified nurse-midwife, certified nurse practitioner, or clinical nurse specialist collaborates.

(1) The standard care arrangement shall be revised to reflect the addition or deletion of a physician or podiatrist with whom the nurse collaborates within that employment setting. Under these circumstances, a new standard care arrangement is not necessary.

(2) A new standard care arrangement shall be executed when the nurse is:

(a) Employed at a different or additional organization or practice; and

(b) Engages in practice with a collaborating physician or podiatrist outside of the primary employing organization.

(B) Except as provided in paragraph (C) of this rule [regarding psychiatric-mental health certified nurse specialists], a certified nurse-midwife, certified nurse practitioner, or clinical nurse specialist engaged in the practice of the nurse's specialty, shall enter into a written standard care arrangement with one or more collaborating physicians or podiatrists whose practice is the same or similar to the nurse's practice.

\*          \*          \*

(D) The standard care arrangement shall include at least:

(1) The signatures of each nurse, and each collaborating physician, or the physician's designated representative, or each podiatrist with whom the certified nurse-midwife, certified nurse practitioner, or clinical nurse specialist primarily collaborates indicating review of and agreement to abide by the terms of the standard care arrangement. For purposes of this rule, a physician's designated representative means a physician who serves as the department or unit director or chair, within the same institution, organization or facility department or unit, and within the same practice specialty, that the nurse practices, and with respect to whom the physician has executed a legal authorization to enter collaborating agreements on the physician's behalf;

(2) The date when the arrangement is initially executed;

(3) The date of the most recent review of the arrangement;

(4) The complete name, specialty and practice area, business address, and business phone number or number at which the individual can be reached at any time for:

(a) Each collaborating physician or podiatrist with whom the certified nurse-midwife, certified nurse practitioner, or clinical nurse specialist primarily collaborates and who is a party to the standard care arrangement, unless a physician's designated representative has entered the standard care arrangement on the physician's behalf; and

(b) Each certified nurse-midwife, certified nurse practitioner, or clinical nurse specialist who is a party to the standard care arrangement;

(5) A statement of services offered by the certified nurse-midwife, certified nurse practitioner, or clinical nurse specialist consistent with section 4723.43 of the Revised Code and this chapter, including a description of the scope of prescriptive practice and authorization to enter consult agreements for patients, if applicable;

(6) A plan for incorporation of new technology or procedures consistent with the applicable scope of practice as set forth in section 4723.43 of the Revised Code and this chapter;

(7) Quality assurance provisions, including at least:

(a) When modification is made to the body of the standard care arrangement, reapproval of the standard care arrangement is required;

(b) Criteria for referral of a patient by the certified nurse-midwife, certified nurse practitioner, or clinical nurse specialist to a collaborating

physician or podiatrist, including, for the certified nurse-midwife, a plan for referral of breech or face presentation or any other abnormal condition identified as such in the standard care arrangement;

(c) A process for the certified nurse-midwife, certified nurse practitioner, or clinical nurse specialist to obtain consultation from a physician or podiatrist; and

(d) A process for chart review in accordance with rule 4723-8-05 of the Administrative Code if the nurse's practice includes any direct patient care;

(8) A plan for coverage of patients in instances of emergency or planned absences of either the certified nurse-midwife, certified nurse practitioner, or clinical nurse specialist, or the collaborating physician or podiatrist;

(9) A process for resolution of disagreements regarding matters of patient management; and

(10) Regarding the prescribing component of the clinical nurse specialist, certified nurse-midwife, or certified nurse practitioner's practice, the following quality assurance provisions shall include at least:

(a) Provisions to ensure timely direct, personal evaluation of the patient with a collaborating physician or the physician's designee when indicated;

(b) Prescribing parameters for drugs or therapeutic devices when indicated;

(c) Provisions for the use of schedule II controlled substances;

(d) If the nurse is prescribing to minors, as defined in division (A) of section 3719.061 of the Revised Code, provisions for complying with section 3719.061 of the Revised Code when prescribing an opioid analgesic to a minor; and

(e) Provisions for obtaining and reviewing OARRS reports, and engaging in physician consultation and patient care consistent with section 4723.487 of the Revised Code and rule 4723-9-12 of the Administrative Code.

(11) Quality assurance standards consistent with rule 4723-8-05 of the Administrative Code.

(E) The most current copy of the standard care arrangement, and any legal authorization signed by a physician according to paragraph (D)(1) of this rule, shall be retained on file by the nurse's employer. Upon request of the board, the certified nurse-midwife, certified nurse practitioner, or clinical nurse specialist shall immediately provide a copy of the standard care arrangement to the board.

{¶27} Thus, requiring the appellees to engage in health care work for the appellant without supervision agreements in place with a physician violates Ohio law. Further, such a requirement potentially exposes appellee Steven Croston to disciplinary action and civil penalties. The Agreement failed to provide, and the appellant failed to otherwise ensure, that the appellees would be under the direct supervision of a physician and a supervision agreement would be in place as required by Ohio law.

{¶28} Rescission of the Agreement was an appropriate remedy in the case sub judice. The Agreement was executory in nature, as none of the fundamental requirements had yet occurred - the appellees had neither scheduled nor conducted four consultative exams within a one month period, nor had the appellant paid any compensation to the appellees. Further, to enforce the Agreement would require the appellees to conduct the exams without having physician supervision agreements in place as required by Ohio law. Accordingly, summary judgment was properly granted to the appellees, and the appellant's third assignment of error is without merit and is therefore overruled.

{¶29} Our determination regarding assignment of error number three renders the appellant's assignments of error numbers one and two moot.

**CONCLUSION**

{¶30} Based upon the foregoing, the appellant's assignments of error numbers one, two and three are overruled, and the decision of the Canton Municipal Court is hereby affirmed.

By: Baldwin, J.

Delaney, P.J. and

King, J. concur.